78 N.J. Super. 414 (1963)
188 A.2d 642
CHRISTOPHER JACKMAN AND WINFIELD CHASMAR, JR., PLAINTIFFS,
v.
JOHN M. BODINE, COUNTY CLERK OF WARREN COUNTY; HENRY B. CARR, COUNTY CLERK OF SUSSEX COUNTY; THOMAS J. GRIEVES, COUNTY CLERK OF SALEM COUNTY; BERGEN N. CARTER, JR., COUNTY CLERK OF HUNTERDON COUNTY; HENRY F. ANDERSON, COUNTY CLERK OF CAPE MAY COUNTY; ROBERT J. BURKHARDT, SECRETARY OF STATE OF THE STATE OF NEW JERSEY; FRANK S. FARLEY, PRESIDENT OF THE SENATE OF THE STATE OF NEW JERSEY, AND JOHN W. DAVIS, SPEAKER OF THE GENERAL ASSEMBLY OF THE STATE OF NEW JERSEY, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided February 21, 1963.
*417 Mr. Jacob Friedland (Mr. David Friedland and Mr. Edward Cohen, appearing) for plaintiffs.
Mr. Archie Roth for defendant John M. Bodine.
Messrs. Dolan and Dolan (Mr. John T. Madden, appearing) for defendant Henry B. Carr.
Messrs. Friedman & Telsey (Mr. George S. Friedman, appearing) for defendant Thomas J. Grieves.
Messrs. Boswell & Boswell (Mr. John E. Boswell, appearing) for defendant Henry F. Anderson.
Mr. Arthur J. Sills, Attorney General of New Jersey (Mr. Theodore I. Botter, First Assistant Attorney General, appearing) for defendants Robert J. Burkhardt and John W. Davis.
Mr. Wesley L. Lance and Messrs. O'Mara, Schumann, Davis & Lynch (Mr. James Dorment, Jr., appearing) for defendant Frank S. Farley.
PASHMAN, J.S.C.
Plaintiffs Christopher Jackman, a resident of West New York, New Jersey (Hudson County), and Winfield Chasmar, Jr., a resident of Verona, New Jersey (Essex County), instituted this action "for themselves and on behalf of all other taxpayers, property owners and legal voters similarly situated" seeking, inter alia, an adjudication that the provisions in the New Jersey Constitution pertaining to the composition of this State's General Assembly and Senate violate the Equal Protection and Due Process Clauses of the Fourteenth Amendment of the Federal Constitution. More *418 specifically, the plaintiffs allege that N.J. Const., Art. IV, § II, par. 1, which directs that the State Senate "shall be composed of one Senator from each county," embodies an invidiously discriminatory geographic classification which arbitrarily denies fair and adequate legislative representation to a majority of the voters in this State. The one county-one senator form of representation is alleged to disregard population, land, area and economic interests. Finally, plaintiffs claim in connection with the State Senate, that the senatorial districts envisioned by that article do not represent or reflect any rational or legally permissible state policy.
N.J. Const., Art. IV, § III, par. 1, provides that each county shall at all times be entitled to one representative in the General Assembly. Count two of the complaint alleges that this constitutes "a substantial and unconstitutional deviation from the total-population or total-voter standard required by the Fourteenth Amendment to the United States Constitution." The limitation of the total membership of the General Assembly to 60 persons, together with the guarantee to the smallest county that it shall have one member in the General Assembly, is said to debase and dilute the votes of individuals residing in the more populous counties and to subject them to taxation without representation.
In addition to the first two counts, the plaintiffs, in a third count of their complaint, ask the court to declare N.J. Const., Art. IX, as repugnant to the Fourteenth Amendment on the ground that since the voters may not propose amendments by either popular referendum or initiative  Article IX provides, in substance, that all amendments to the New Jersey State Constitution must originate in either the Senate or General Assembly  the plaintiffs and all individuals similarly situated have been arbitrarily deprived of an equal right to participate in changing the nature and form of their state government.
The defendants in this case are the county clerks of Warren, Sussex, Salem, Hunterdon and Cape May Counties, and the Secretary of State, the President of the Senate and the Speaker of the General Assembly of the State of New Jersey. *419 It was stipulated that in case of a vacancy or change in office the suit would be considered as one against the particular office or officeholder, as the case may be, at the time of judgment. They dispute at the outset the right of the plaintiffs to be awarded any affirmative relief in this action, stating, with certain unimportant exceptions as between the defendants, that the matter presented for disposition involves a "political question" over which the court has no jurisdiction; and that, in any event, there is no basis for concluding that the constitutional provisions under attack either reflect or foster an arbitrary impairment of voting rights.
In order to obtain an early resolution of the constitutional issues, the Attorney General of the State of New Jersey has moved to dismiss the plaintiffs' complaint for failure to state a justiciable cause of action or, in the alternative, for summary judgment pursuant to R.R. 4:58-1 et seq. Comprehensive legal memoranda have been submitted by the parties and an opportunity has been afforded all parties in interest to verbally present their respective positions.
The case sub judice represents, in part at least, a response to the United States Supreme Court's decision in Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), which, according to one observer, has "catalyzed a new political synthesis that was already straining, so to speak, to come into being." McCloskey, Foreword: "The Reapportionment Case," 76 Harv. L. Rev. 54, 57 (1962). Cf. Asbury Park Press Inc. v. Woolley, 33 N.J. 1 (1960). Since each of the issues in the case must, of necessity, touch on some phase of the Baker decision, no better or more logical starting point exists than a comprehensive scrutinization of that case which has produced a "short-term response which has been nothing short of astonishing." McCloskey, op cit. supra, at p. 56.
The plaintiffs in Baker were Tennessee voters who instituted an action in the Federal District Court under 42 U.S.C., §§ 1983 and 1988 claiming that the Tennessee Apportionment Act of 1901 operated to arbitrarily deny them, and others similarly situated, equal protection of the laws as *420 provided for and guaranteed them by the Fourteenth Amendment of the United States Constitution. The substance of the plaintiffs' constitutional claim was that the Tennessee legislature had failed, since 1901, to reapportion decennially both of its houses despite, and in violation of, excess provisions of the Tennessee Constitution which prescribed apportionment of representatives according to the number of qualified voters in each county subject to a ten-year reapportionment adjustment, if necessary. The District Court found that the case presented a "question of distribution of political strength for legislative purposes," 179 F. Supp. 824, 826 (M.D. Tenn. 1961), and dismissed the complaint for (a) failure to state a claim upon which relief could be granted, and (b) lack of subject-matter jurisdiction.
The United States Supreme Court, in an opinion by Mr. Justice Brennan, reversed and remanded, holding that (1) the District Court possessed jurisdiction over the subject matter since the complaint involved a case arising under the Equal Protection Clause of the Federal Constitution; (2) plaintiffs-appellants had standing to challenge the Tennessee apportionment statute since they sought to protect or vindicate their rights to have an equal status with voters in all counties free from arbitrary state action; and (3) a justiciable cause of action was stated by the plaintiffs' claim that their voting rights had been arbitrarily impaired by virtue of the Tennessee legislature's failure to reapportion since 1901. Baker v. Carr, supra.
Subsequent decisions in other jurisdictions have intimated, relying upon a purported abstract holding of Baker v. Carr, that Baker requires that either or both houses of a state legislature must, to some extent, be apportioned on the basis of population. See, e.g., Toombs v. Fortson, 205 F. Supp. 248 (N.D. Ga. 1962). In my opinion, they have misconstrued the decision in Baker v. Carr. As was said most succinctly in Sobel v. Adams, 208 F. Supp. 316, 321 (S.D. Fla. 1962):
*421 "It is not required that, in all events, either or both houses of a bicameral legislature must be apportioned upon a population basis of either exact or approximate equality of representation. It is only when the discrimination is invidious or lacking in rationality that it clashes with the Equal Protection Clause of the Fourteenth Amendment. Mr. Justice Clark suggests that there must be a plan that follows a rational policy. 369 U.S. 186, 258 [82 S.Ct. 691, 7 L.Ed.2d 663]. Mr. Justice Douglas, in his concurring opinion in Baker v. Carr, notes that `Universal equality is not the test; there is room for weighting.' Mr. Justice Douglas cites Williamson v. Lee Optical Co., [348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563], for a statement of the rule that `the prohibition of the Equal Protection Clause goes no further than the invidious discrimination.' 369 U.S. 186, 244-245, 82 S.Ct. 691, 724."
Plaintiffs argue that the Fourteenth Amendment does require consideration of population differentials re senatorial districts, relying, to a great extent, upon the decision of a three-judge Federal District Court in Sims v. Frink, 208 F. Supp. 431 (M.D., N.D. Ala. 1962). In Sims the court first noted that the Alabama Constitution required representation in both houses according to population. An amendment was proposed which provided for one senator from each of 67 counties which, said the court, "would serve to make the discrimination in the Senate even more invidious than at present." 208 F. Supp., at p. 438. The court continued:
"The only conceivable rationalization of this provision is that it is based on political units of the State and is analogous to the requirement of the Constitution of the United States * * *. The analogy cannot survive the most superficial examination into the history of the requirement of the Federal Constitution and the diametrically opposing history of the requirement of the Alabama Constitution that representation shall be based on population. Nor can it survive a comparison of the different political natures of states and counties." (at p. 438, emphasis added)
In addition to the aforementioned misconception of Baker, it is of the utmost importance to emphasize that the court in that case did not attempt to create any new judicial standards for the lower courts to apply when faced with a claim of arbitrary state action in the field of legislative apportionment. *422 Mr. Justice Brennan stated, after finding that the question presented could be adjudicated by applying judicially manageable standards, that:
"Judicial standards under the Equal Protection Clause are well developed and familiar, and it has been open to the courts since the enactment of the Fourteenth Amendment to determine, if on the particular facts they must, that a discrimination reflects no policy, but simply arbitrary and capricious action." (369 U.S., at p. 226, 82 S.Ct., at p. 715)
If anything can be legitimately drawn from the italicization of the word no in the preceding passage, it is that the Supreme Court reaffirmed the existing guidelines of the Equal Protection Clause which permit states a wide scope of discretion in enacting laws which affect some groups of citizens differently from others. The test is one of rational classification, and a discriminatory law "will not be set aside if any state of facts reasonably may be conceived to justify it." McGowan v. Maryland, 366 U.S. 420, 426, 6 L.Ed.2d 393, 81 S.Ct. 1356 (1961) (emphasis added). Cf. also, Baker v. Carr, supra (separate concurring opinions of Mr. Justice Douglas, 369 U.S., at p. 241, 82 S.Ct., at p. 722 and Mr. Justice Clark, at p. 251, 82 S.Ct., at p. 727).

I.

JUSTICIABILITY.
The first critical question raised by the defendants in this case is whether the plaintiffs' complaint is justiciable. The Attorney General argues that the plaintiffs' action is a direct attack upon New Jersey's republican form of government and as such it presents a "political question" which, even under Baker, remains non-justiciable. Defendant Farley contends that Baker only permits judicial cognizance of attacks upon or challenges to the exercise of state power within the framework of a given structure; and that it remains the law that any claim which cannot be adjudicated without reference to *423 the validity of the form of government with which a state entered the Union must fall as presenting a non-justiciable political question. The plaintiffs, in opposition to the defendants' attempt to have the case dismissed before the merits are reached, argue that their complaint embodies a challenge to the composition of state legislative bodies on the ground of invidious discrimination in violation of the Fourteenth Amendment and therefore a justiciable cause of action is stated and the courts must take jurisdiction. See Scholle v. Hare, 369 U.S. 429, 82 S.Ct. 910, 8 L.Ed.2d 1 (1962); W.M.C.A. v. Simon, 370 U.S. 190, 82 S.Ct. 1234, 8 L.Ed.2d 430 (1962).
While it is true, as the defendants point out, that the Supreme Court did not completely expunge the doctrine that political questions are non-justiciable, Baker did contribute significantly to an understanding of the relationship between future malapportionment suits, the Guaranty Clause of the United States Constitution (Art. IV, § 4), and the doctrine of "political questions." After noting that a suit which seeks protection of a political right does not ipso facto present a political question, the court noted that any malapportionment suit which is predicated solely on the Guaranty Clause would be futile. 369 U.S., at pp. 217-218, 82 S.Ct., at p. 710. In a like manner, litigants in such suits were cautioned that the Fourteenth Amendment basis for their action must not be inextricably enmeshed with political question elements which render Guaranty Clause claims non-justiciable per se. 369 U.S., at p. 217, 82 S.Ct., at p. 710.
Although this court agrees that there is a distinction between a challenge to a structure or form of a state government and a challenge to the exercise of state power within the framework of that structure, it does not follow that the distinction precludes a finding of justiciability in a case which is predicated upon a claim of invidious discrimination under the Equal Protection Clause. The challenge presented by the plaintiffs in this action does, in a sense, represent a challenge to New Jersey's form of government. It is such a challenge, *424 however, only because the alleged defect happens to be condoned by a state constitutional provision whose antecedents predate New Jersey's entry into the Union. See N.J. Const. (1776), Art. III.
The challenge, however, is not a direct one aimed solely at this State's governmental structure. Rather, it is an assertion of arbitrary state action in creating the framework of New Jersey's system of political representation, resulting in individious discrimination.
Acceptance of the defendants' argument would effectively foreclose any attack upon legislative representation within a given constitutional structure since it would be impossible to assail the method of classification without also assailing the chosen form of governmental organization. In my opinion, one senator from each county is a method of classification which, like any other, is and should be subject to judicial scrutiny directed toward the ascertainment of whether the given method reflects "no policy" and therefore offends the Equal Protection Clause of the Fourteenth Amendment. The fact that a constitutional provision is attacked, and not a statutory enactment, makes no material difference since the apparent trend is against judicial timidity in the area of voting rights where invidiously discriminatory geographic classification is alleged. Cf. W.M.C.A. v. Simon, supra. In short, "It is ludicrous to preclude judicial relief when a mainspring of representative government is impaired." Dyer v. Kazuhisa Abe, 138 F. Supp. 220, 236 (D.C. Hawaii 1956), reversed on other grounds and dismissed, 256 F.2d 728 (9 Cir. 1958).

II.

THE MERITS.
Having found that the instant action involves a justiciable question, examination into the merits is now in order. Art. IV, § II, par. 1, of the New Jersey Constitution is attacked on the ground that it is a repository of invidiously discriminatory *425 geographic classification. It provides, I repeat, with respect to the State Senate that:
"The Senate shall be composed of one Senator from each county, elected by the legally qualified voters of the county, for a term [of four years]." (Emphasis added.)
N.J. Const., Art. IV, § III, par. 1, which deals with the General Assembly states:
"The General Assembly shall be composed of members elected biennially by the legally qualified voters of the counties [for a two-year term]. The members of the General Assembly shall be apportioned among the several counties as nearly as may be according to the number of their inhabitants, but each county shall at all times be entitled to one member and the whole number of members shall never exceed sixty. The present apportionment shall continue until the next census of the United States shall have been taken. Apportionment of the members of the General Assembly shall be made by the Legislature at the first session after the next and every subsequent census, and each apportionment when made shall remain unaltered until the following census shall have been taken." (Emphasis added.)
It is well to point out, initially, that while a presumption of validity attends state constitutional provisions, see, e.g., W.M.C.A. v. Simon, 208 F. Supp. 368, 379 (S.D.N.Y. 1962) (on remand), even these provisions will be struck down as violative of the United States Constitution where the facts so warrant. See, e.g., Scholle v. Hare, 367 Mich. 176, 116 N.W.2d 350, 352, 354 (Sup. Ct. 1962) (on remand).
As the Supreme Court made eminently clear in Testa v. Katt, 330 U.S. 386, 391, 67 S.Ct. 810, 813, 91 L.Ed. 967 (1947):
"[T]he Constitution [of the United States] and the laws passed pursuant to it are the supreme laws of the land, binding alike upon states, courts, and the people, `any thing in the Constitution or Laws of any State to the Contrary notwithstanding.'" [U.S. Const. Art. VI]. (Emphasis added.)
The form of government reflected by the two New Jersey constitutional paragraphs in issue closely approximate the scheme envisioned by the New Jersey Constitution of 1776 which provided for a legislative council composed of one person *426 from each county (Senate) and an assembly having three persons from each county (General Assembly). N.J. Const. 1776, Art. III. The right was reserved to said legislature, at any time or times thereafter "to add to or diminish the number or proportion of the members of the Assembly for any county or counties * * * on the principles of more equal representation, * * *." (But the representatives in the Assembly were not, at any time, to be less than 39 in number.) This bicameral form was continued in the New Jersey Constitution of 1844, but provision was made for the first time for a General Assembly which would specifically accord with population differentials between the various county units. N.J. Const. 1844, Art. IV, § 3, par. 1. The representational basis for the Senate remained the same. N.J. Const. 1844, Art. IV, § 2, par. 1.
The present action represents an attack on existing state constitutional provisions. Other decisions in the malapportionment area generally fall into three separate factual groups: (1) an attack on a state legislature's failure to reapportion in accordance with explicit state constitutional directives pertaining to apportionment (see, e.g., Baker v. Carr, supra); (2) an attack on a state legislature's method of implementing, by legislation, a constitutional mandate concerning apportionment (see, e.g., W.M.C.A. v. Simon, 370 U.S. 190, 82 S.Ct. 1234, 8 L.Ed.2d 430, supra; Mann v. Davis, 213 F. Supp. 577 (E.D. Va. 1962)); and (3) an attack on a constitutional amendment designed to rectify an existing malapportionment situation (see, e.g., Sims v. Frink, supra; and Scholle v. Hare, 367 Mich. 176, 116 N.W.2d 350 (Sup. Ct. 1962) (on remand)). An examination of the factual differences between these various groups is helpful in determining the extent to which the legal conclusions are applicable to the instant action. The common factual thread characteristic of the first class of cases is a total absence of legislative initiative or action despite significant population changes. More particularly, in Baker, Tennessee had not reapportioned its General Assembly since 1901 despite *427 the existence of a provision in the Tennessee Constitution that decennial reapportionment was required. Similarly, the court in Toombs v. Fortson, supra, noted that legislative inaction over the years had distorted the original county unit plan of the Georgia Constitution into something different than it was at its genesis. 205 F. Supp. 248, at p. 256.
In the second class of cases, the courts have stressed that the legislative action under review did not reflect a rational policy. It was argued in W.M.C.A. v. Simon, 208 F. Supp. 368, supra, that a mathematical formula allegedly lacked a rational basis when actually applied to existing population figures. In Mann v. Davis, supra, the court actually found that the 1962 reapportionment act passed by the Virginia legislature was unconstitutional because of its unexplained unequal allotment of representatives.
The two cases which I have placed in the third classification involved legislative attempts to substitute less rational state governments for schemes which were already invidiously discriminatory. Thus the division of legislative seats based upon the new census figures in Michigan was found to be violative of the Equal Protection Clause, Scholle v. Hare, supra (on remand), and the attempt by the Alabama legislature in the "67 Senator Amendment" to replace an admittedly unconstitutional legislature with one which was even more discriminatory was rejected in Sims v. Frink, supra, which noted also that the legislature was not adhering to the requirement of the Alabama Constitution that population had to be considered to some extent when reapportionment was undertaken.
The remaining area of attack, i.e., a challenge to a constitutional provision which apportions one legislative house on an area basis alone, was the subject matter of a suit in Maryland where the issue presented was whether "the Fourteenth Amendment, which guarantees equal protection, requires that a State having one House of its Legislature fairly based on population, shall also base its other House on population?" Maryland Committee For Fair Representation v. Tawes (Cir. Ct. 1962) (supplemental opinion on remand). The court *428 concluded that the constitutional provision in question was valid and that representation in one house may be constitutionally based upon area and geographical location regardless of population since "(1) the system protects minorities and prevents hasty although popular legislation at the time"; "(2) it preserves checks and balances and the republican form of government"; "(3) it is based on history, tradition and reason." (Reprint from The Daily Record, Baltimore, Md., July 2, 1962.) This opinion was affirmed per curiam. See Maryland Committee For Fair Representation v. Tawes, 182 A.2d 877 (Md. Ct. App. 1962). Subsequently, the Maryland Court of Appeals filed an opinion which detailed the reason for their per curiam affirmance. See Maryland Committee For Fair Representation v. Tawes, 229 Md. 406, 184 A.2d 715 (1962).

IIA.

THE CHALLENGE TO THE NEW JERSEY SENATE.
To regress, the plaintiffs' position concerning the constitutionality of the New Jersey Senate is two-pronged. First, the plaintiffs maintain that New Jersey cannot completely ignore the population differentials between its various senatorial districts in apportioning its Senate. Second, it is argued that even if New Jersey is not required by the Fourteenth Amendment to take population into consideration, the present system of senatorial apportionment, which is based solely on county lines, is totally irrational and therefore violates the Equal Protection Clause.
It has been stated earlier in this opinion that the United States Supreme Court in Baker v. Carr did not, contrary to some interpretations, require or direct states to apportion both houses of their state legislatures on the basis of population. Of course, where the state has an express provision in its state constitution that population must be considered to some extent, a failure by the legislature of that state to follow the constitutional directive will violate the spirit of the Baker case. See, e.g., Moss v. Burkhart, 207 F. Supp. 885 (W.D. Okla. 1962).
*429 Although the court in Baker did not consider the merits of the plaintiffs' claim, it is quite clear that the court forewarned lower tribunals that a representative scheme which reflects no policy is unconstitutional. 369 U.S., at p. 226, 82 S.Ct., at p. 714. The court did not find nor did it intimate that an absence of population considerations inexorably leads to the conclusion that the system under review is invidiously discriminatory. Indeed, if anything can be gleaned from Baker it is that the question of whether or not a particular state's government reflects a rational policy depends upon the facts giving rise to the particular state legislative classification.
Representation in the New Jersey State Senate has been on a one senator per county basis since 1776. The present number of counties, viz., 21, were all created by 1857. See Effross, Post-Colonial Counties in New Jersey: Factors Affecting Their Creation, p. 1 (1962) (a study prepared under the auspices of the Bureau of Government Research of Rutgers, The State University.) "Historically the county was solely a subdivision of the State constituted to administer state power and authority. * * * [T]he county's powers are only those granted to it * * *." Bergen County v. Port of New York Authority, 32 N.J. 303, 312, 313 (1960).
The plaintiffs in this action concede that the 21 counties "were not improperly created or properly created for an improper reason." In addition to this concession, there is ample support found in the available historical studies which indicate that the county system evolved historically in response to a variety of considerations, ranging from disparities between competing and varied sectional economic interests, the emergence of large cities, the need for relocating seats of local government and the courts in order to service individuals in separate geographic areas, and demands of political factions for more compact units to represent local interests. See, e.g., Leaming & Spicer, The Grants, Concessions, and Original Constitutions of the Province of New Jersey 229, 305, 507, 530 (2d ed. 1881); A History of Morris County, New Jersey, vol. 1, pp. 4-5 (1914); 1 Heston, South Jersey, A *430 History, 1664-1924, p. 251, 2 Id., at pp. 732, 834; Snell, History of Sussex and Warren Counties, New Jersey 149 (1881); Honeyman, Northwestern New Jersey 589 (1927); Kull, New Jersey, a History 587 (1930).
The fact that the present system of representation in our State Senate does not attempt to equalize disproportionate population differences between the various counties (see Table A in the Appendix) is not conclusive on the ultimate question of whether or not the system discriminates invidiously. To be sure, where the makeup of one branch of state government completely disregards population as a factor in representation, some discrimination must result. But it is only when the discrimination is invidious or when the discrimination reflects no policy that the state legislative branch must reorganize itself or be reorganized. The fact that a court does not personally agree with the method of choosing representatives for a coordinate branch of government is immaterial. As the court stated in Levitt v. Maynard, 104 N.H. 243, 182 A.2d 897 (Sup. Ct. 1962), in the course of holding that an apportionment of senatorial districts on the basis of direct taxes, without any conscious regard to population, did not offend the Fourteenth Amendment:
"While the author of this opinion or some members of this court may not be enchanted with the present method of determining senatorial districts, we cannot say that it is without rational basis or that it has produced an unrepresentative selection for the upper house of the Legislature. * * * Some leeway in the political process is inevitable since `* * * the machinery of government would not work if it were not allowed a little play in its joints.' Mr. Justice Holmes in Bain Peanut Co. of Texas v. Pinson, 282 U.S. 499, 501, 51 S.Ct. 228, 229, 75 L.Ed. 482." (Emphasis added.)
The Fourteenth Amendment does not ideologically forbid a political system of geographic representation in a state legislature where, as is the case in New Jersey, the units which make up the geographical classification possess intrinsic validity as distinct governmental subdivisions. In any event, a state may adopt a system of unequal numerical representation *431 so long as there is a rational basis for the inequality. In the words of the Supreme Court of the United States in MacDougall v. Green, 335 U.S. 281, 69 S.Ct. 1, 93 L.Ed. 3 (1948):
"To assume that political power is a function exclusively of numbers is to disregard the practicalities of government. Thus, the Constitution protects the interests of the smaller against the greater by giving in the Senate entirely unequal representation to populations. It would be strange indeed, and doctrinaire, for this Court, applying such broad constitutional concepts as due process and equal protection of the laws, to deny a State the power to assure a proper diffusion of political initiative as between its thinly populated counties and those having concentrated masses, in view of the fact that the latter have practical opportunities for exerting their political weight at the polls not available to the former. The Constitution  a practical instrument of government  makes no such demands on the States." (at pp. 283-284, 69 S.Ct., at p. 2)
The fact that the composition of the New Jersey State Senate closely approximates or is similar to that of the United States Senate is  contrary to the defendants' contention  of little assistance in solving the terminal constitutional question. The sovereignty possessed by the states under the Federal Government is not enjoyed by the counties under our State Government. See Bergen County v. Port of New York Authority, supra. Just as in other states, a county in New Jersey derives its power from the State and is but a governmental agency which possesses no express powers which transcend the law by which the inferior governmental unit is created. Cf. Sims v. Frink, supra. The Equal Protection Clause of the Fourteenth Amendment is a proscription directed to the states without reference to the nature of the political structure of the national government. Scholle v. Hare, supra, 116 N.W.2d, at p. 386 (concurring opinion of Black, J.).
I find that the plaintiffs in the case sub judice have failed to establish that the apportionment of senators according to counties is arbitrary, capricious or invidiously discriminatory. The existence of population differentials and land *432 area differentials (see Table B in Appendix) does not overcome the conclusion that a rational policy does exist for the geographic division of the State Senate. As the District Court in Baker v. Carr, 206 F. Supp. 341 (M.D. Tenn. 1962), so aptly stated, after remand:
"We find no basis for holding that the Fourteenth Amendment precludes a state from enforcing a policy which would give a measure of protection and recognition to its less populous governmental units. These subdivisions constitute an integral and historic part of the state's governmental structure. They have real and substantial interests in the state's laws, and the state could reasonably conclude that its best interests would be subserved by their effective participation in state government and in the formulation of its laws and policies. The state has the right, if it sees fit, to assure that its smaller and less populous areas and communities are not completely overridden by sheer weight of numbers." (at p. 346)
Our State has seen fit to give each of its partially autonomous subunits known as counties equal representation in the Senate. One hundred and eighty-seven years of continual growth and development bear witness to the wisdom of that choice. While the benevolence bestowed upon the rural voter may be criticized, it is fallacious to conclude that it is without rational justification.
The principles of democratic government are, and should be, subject to the most searching and critical evaluation by the judiciary. However, courts should be loath to discard an operative system of government on the basis of vague and untenable contentions of invidious discrimination. New Jersey's Senate, based as it is on a constitutionally permissible policy of "[assuring] a proper diffusion of political initiative as between its thinly populated counties and those having concentrated masses," MacDougall v. Green, supra, 335 U.S., at p. 284, 69 S.Ct., at p. 2, does not transgress the inhibitions of the Fourteenth Amendment. This State, by adopting historic and well-defined governmental subdivisions, has apportioned its upper house on a rational basis.

*433 IIB.

THE CHALLENGE TO THE GENERAL ASSEMBLY.
The plaintiffs' attack on the apportionment of the General Assembly is predicated upon a claim that there is a "vast and substantial disparity in voting strength among the various counties" under the present constitutional and statutory sections. Without dwelling on this contention at great length, suffice it to say that the present formula by which this State's lower house is apportioned, i.e., the Method of Equal Proportions, N.J.S.A. 52:10-5 (1962), has been approved "as producing * * * the smallest relative difference in the individual share in an assemblyman." Asbury Park Press, Inc. v. Wooley, 33 N.J. 1, 9 (1960). See also Chafee, "Congressional Reapportionment," 42 Harv. L. Rev. 1015 (1928). In any event, the plaintiffs have not offered a scintilla of factual data which would justify the adoption of their legal conclusions. The General Assembly has been apportioned pursuant to and within the framework of the directives of our Supreme Court in the Asbury Park Press case. This court will not substitute its judgment for that of the Legislature where, as in this case, State and Federal Constitutional provisions have simply not been violated.

III.

CONSTITUTIONALITY OF ARTICLE IX.
The contention raised by the plaintiffs that Article IX of the New Jersey Constitution violates the Fourteenth Amendment is palpably without merit. Since the legislative branch of our government is properly constituted, this court sees no requirement to constitutionally afford the people of this State the right to propose amendments to the State Constitution through either initiative or referendum. The amendment procedure is committed, by Article IX, to a validly constituted *434 Legislature which may adequately express the will of the people.
It is the conclusion of this court that the sections of the New Jersey Constitution which are challenged by the plaintiffs do not violate the intent and meaning of the Fourteenth Amendment. Our particular bicameral system is the product of a rational historical development. Economic, political and geographical considerations, together with a desire to insure a proper diffusion of power between small and large geographical entities, led to the creation of counties as political subdivisions for purposes of representative units in the Senate. Representation according to population was adopted for the lower house. The machinery of our State Government has performed successfully because of this "play in its joints." Bain Peanut Co. v. Pinson, supra. This court will not supplant the practical fluidity of New Jersey's legislative branch with the theoretical rigidity contemplated by the plaintiffs.
The parties are directed to submit a judgment, in accordance with this opinion, in favor of the defendants and against the plaintiffs on all counts. If the judgment cannot be agreed to, the parties may submit the proposed forms for settlement.

APPENDIX.

TABLE A

U.S. BUREAU OF CENSUS, 1960 CENSUS OF POPULATION, NEW JERSEY

 County Population
 Atlantic ............................ 160,880
 Bergen .............................. 780,255
 Burlington .......................... 224,499
 Camden .............................. 392,035
 Cape May ............................ 48,555
 Cumberland .......................... 106,850
 Essex ............................... 923,545
 Gloucester .......................... 134,840
 Hudson .............................. 610,734
 Hunterdon ........................... 54,107
 Mercer .............................. 266,392
 Middlesex ........................... 433,856
 Monmouth ............................ 334,401

*435
 Morris .............................. 261,620
 Ocean ............................... 108,241
 Passaic ............................. 406,618
 Salem ............................... 58,711
 Somerset ............................ 143,913
 Sussex .............................. 49,255
 Union ............................... 504,255
 Warren .............................. 63,220

It is interesting to note in connection with these figures, that a recent study by Dr. Ernest C. Reock, Jr. of the Bureau of Government Research, Rutgers University, New Jersey, "Population Inequality Among Counties in the New Jersey Legislature" yielded the following conclusions: (1) The Senators from the 11 smallest counties who constituted a majority of the State Senate represented only 19% of the State's total population; (2) Essex County, the largest county in the State, is 219.7% underrepresented in terms of the relative deviation in population per member method; (3) Hudson County is 111.4% underrepresented; (4) Bergen County is 170.1% underrepresented; (5) Atlantic County is 44% overrepresented; (6) Burlington County is 22.3% overrepresented; (7) Cumberland County is 63% overrepresented; and (8) Cape May County is 83% overrepresented.

 TABLE B
 Land Area in
 County Square Miles, 1960
 Atlantic ................................ 575
 Bergen .................................. 233
 Burlington .............................. 819
 Camden .................................. 221
 Cape May ................................ 267
 Cumberland .............................. 503
 Essex ................................... 128
 Gloucester .............................. 329
 Hudson .................................. 45
 Hunterdon ............................... 435
 Mercer .................................. 228
 Middlesex ............................... 312
 Monmouth ................................ 477
 Morris .................................. 467

*436
 Ocean ................................... 639
 Passaic ................................. 194
 Salem ................................... 350
 Somerset ................................ 307
 Sussex .................................. 528
 Union ................................... 103
 Warren .................................. 361
 ___
 TOTAL 7521 square
 miles

Figures taken from 1960 Census of Population, United States Department of Commerce, vol. I, p. 32-13.