Mr. Justice Stewart,
whom Mr. Justice Clark joins,
dissenting.*
It is important to make clear at the outset what these cases are not about. They have nothing to do with the denial or impairment of any person’s right to vote. Nobody’s right to vote has been denied. Nobody’s right to vote has been restricted. Nobody has been deprived of the right to have his vote counted. The voting right cases which the Court cites are, therefore, completely wide of the mark.[1] Secondly, these cases have nothing to do with the “weighting” or “diluting” of votes cast within any electoral unit. The rule of Gray v. Sanders, 372 U. S. 368, is, therefore, completely without relevance here.[2] Thirdly, these cases are not concerned with the election of members of the Congress of the United States, governed by Article I of the Constitution. Consequently, *877 the Court’s decision in Wesberry v. Sanders, 376 U. S. 1, throws no light at all on the basic issue now before us.[3]
The question involved in these cases is quite a different one. Simply stated, the question is to what degree, if at all, the Equal Protection Clause of the Fourteenth Amendment limits each sovereign State’s freedom to establish appropriate electoral constituencies from which representatives to the State’s bicameral legislative assembly are to be chosen. The Court’s answer is a blunt one, and, I think, woefully wrong. The Equal Protection Clause, says the Court, “requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis.” [4]
After searching carefully through the Court’s opinions in these and their companion cases, I have been able to find but two reasons offered in support of this rule. First, says the Court, it is “established that the fundamental principle of representative government in this country is one of equal representation for equal numbers of people . ...” [5] With all respect, I think that this is not correct, simply as a matter of fact. It has been unan-swerably demonstrated before now that this “was not the colonial system, it was not the system chosen for the national government by the Constitution, it was not the system exclusively or even predominantly practiced by the States at the time of adoption of the Fourteenth Amendment, it is not predominantly practiced by the *878 States today.” [6] Secondly, says the Court, unless legislative districts are equal in population, voters in the more populous districts will suffer a “debasement” amounting to a constitutional injury. As the Court explains it, “To the extent that a citizen’s right to vote is debased, he is that much less a citizen.” [7] We are not told how or why the vote of a person in a more populated legislative district is “debased,” or how or why he is less a citizen, nor is the proposition self-evident. I find it impossible to understand how or why a voter in California, for instance, either feels or is less a citizen than a voter in Nevada, simply because, despite their population disparities, each of those States is represented by two United States Senators.[8]
To put the matter plainly, there is nothing in all the history of this Court’s decisions which supports this constitutional rule. The Court’s draconian pronouncement, which makes unconstitutional the legislatures of most of the 50 States, finds no support in the words of the Constitution, in any prior decision of this Court, or in the 175-year political history of our Federal Union.[9] With *879 all respect, I am convinced these decisions mark a long step backward into that unhappy era when a majority of the members of this Court were thought by many to have convinced themselves and each other that the demands of the Constitution were to be measured not by what it says, *880 but by their own notions of wise political theory. The rule announced today is at odds with long-established principles of constitutional adjudication under the Equal Protection Clause, and it stifles values of local individuality and initiative vital to the character of the Federal Union which it was the genius of our Constitution to create.
I.
What the Court has done is to convert a particular political philosophy into a constitutional rule, binding upon each of the 50 States, from Maine to Hawaii, from Alaska to Texas, without regard and without respect for the many individualized and differentiated characteristics of each State, characteristics stemming from each State’s distinct history, distinct geography, distinct distribution of population, and distinct political heritage. My own understanding of the various theories of representative government is that no one theory has ever commanded unanimous assent among political scientists, historians, or others who have considered the problem.[10] But even if it were thought that the rule announced today by the Court is, as a matter -of political theory, the most desirable general rule which can be devised as a basis for the make-up of the representative assembly of a typical State, I could not join in the fabrication of a constitutional mandate which imports and forever freezes one theory of political thought into our Constitution, and forever denies to every State any opportunity for enlightened and progressive innovation in the design of its democratic institutions, so as to accommodate within a system *881 of representative government the interests and aspirations of diverse groups of people, without subjecting any group or class to absolute domination by a geographically concentrated or highly organized majority.
Representative government is a process of accommodating group interests through democratic institutional arrangements. Its function is to channel the numerous opinions, interests, and abilities of the people of a State into the making of the State’s public policy. Appropriate legislative apportionment, therefore, should ideally be designed to insure effective representation in the State’s legislature, in cooperation with other organs of political power, of the various groups and interests making up the electorate. In practice, of course, this ideal is approximated in the particular apportionment system of any State by a realistic accommodation of the diverse and often conflicting political forces operating within the State.
I do not pretend to any specialized knowledge of the myriad of individual characteristics of the several States, beyond the records in the cases before us today. But I do know enough to be aware that a system of legislative apportionment which might be best for South Dakota, might be unwise for Hawaii with its many islands, or Michigan with its Northern Peninsula. I do know enough to realize that Montana with its vast distances is not Rhode Island with its heavy concentrations of people. I do know enough to be aware of the great variations among the several States in their historic manner of distributing legislative power — of the Governors’ Councils in New England, of the broad powers of initiative and referendum retained in some States by the people, of the legislative power which some States give to their Governors, by the right of veto or otherwise-, of the widely autonomous home rule which many States give to their *882 cities.[11] The Court today declines to give any recognition to these considerations and countless others, tangible and intangible, in holding unconstitutional the particular systems of legislative apportionment which these States have chosen. Instead, the Court says that the requirements of the Equal Protection Clause can be met in any State only by the uncritical, simplistic, and heavy-handed application of sixth-grade arithmetic.
But legislators do not represent faceless numbers. They represent people, or, more accurately, a majority of the voters in their districts — people with identifiable needs and interests which require legislative representation, and which can often be related to the geographical areas in which these people live. The very fact of geographic districting, the constitutional validity of which the Court does not question, carries with it an acceptance of the idea of legislative representation of regional needs and interests. Yet if geographical residence is irrelevant, as the Court suggests, and the goal is solely that of equally “weighted” votes, I do not understand why the Court’s constitutional rule does not require the abolition of districts and the holding of all elections at large.[12]
*883 The fact is, of course, that population factors must often to some degree be subordinated in devising a legislative apportionment plan which is to achieve the important goal of ensuring a fair, effective, and balanced representation of the regional, social, and economic interests within a State. And the further fact is that throughout our history the apportionments of State Legislatures have reflected the strongly felt American tradition that the public interest is composed of many diverse interests, and that in the long run it can better be expressed by a medley of component voices than by the majority’s monolithic command. What constitutes a rational plan reasonably designed to achieve this objective will vary from State to State, since each State is unique, in terms of topography, geography, demography, history, heterogeneity and concentration of population, variety of social and economic interests, and in the operation and interrelation of its political institutions. But so long as a State’s apportionment plan reasonably achieves, in the light of the State’s own characteristics, effective and balanced representation of all substantial interests, without sacrificing the principle of effective majority rule, that plan cannot be considered irrational.
II.
This brings me to what I consider to be the proper constitutional standards to be applied in these cases. Quite simply, I think the cases should be decided by application of accepted principles of constitutional adjudication under the Equal Protection Clause. A recent expression by the Court of these principles will serve as a generalized compendium:
“[T]he Fourteenth Amendment permits the States a wide scope of discretion in enacting laws which affect some groups of citizens differently than others. The constitutional safeguard is offended only if the *884 classification rests on grounds wholly irrelevant to the achievement of the State’s objective. State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.” McGowan v. Maryland, 366 U. S. 420, 425-426.
These principles reflect an understanding respect for the unique values inherent in the Federal Union of States established by our Constitution. They reflect, too, a wise perception of this Court’s role in that constitutional system. The point was never better made than by Mr. Justice Brandéis, dissenting in New State Ice Co. v. Liebmann, 285 U. S. 262, 280. The final paragraph of that classic dissent is worth repeating here:
“To stay experimentation in things social and economic is a grave responsibility. Denial of the right to experiment may be fraught with serious consequences to the Nation. It is one of the happy incidents of the federal system that a single courageous State may, if its citizens choose, serve as a laboratory ; and try novel social and economic experiments without risk to the rest of the country. This Court has the power to prevent an experiment. We may strike down the statute which embodies it on the ground that, in our opinion, the measure is arbitrary, capricious or unreasonable. . . . But in the exercise of this high power, we must be ever on our guard, lest we erect our prejudices into legal principles. If we would guide by the light of reason, we must let our minds be bold.” 285 U. S., at 311.
That cases such as the ones now before us were to be decided under these accepted Equal Protection Clause *885 standards was the clear import of what was said on this score in Baker v. Carr, 369 U. S. 186, 226:
“Nor need the appellants, in order to succeed in this action, ask the Court to enter upon policy determinations for which judicially manageable standards are lacking. Judicial standards under the Equal Protection Clause are well developed and familiar, and it has been open to courts since the enactment of the Fourteenth Amendment to determine, if on the particular facts they must, that a discrimination reflects no policy, but simply arbitrary and capricious action.”
It is to be remembered that the Court in Baker v. Carr did not question what had been said only a few years earlier in MacDougall v. Green, 335 U. S. 281, 284:
“It would be strange indeed, and doctrinaire, for this Court, applying such broad constitutional concepts as due process and equal protection of the laws, to deny a State the power to assure a proper diffusion of political initiative as between its thinly populated counties and those having concentrated masses, in view of the fact that the latter have practical opportunities for exerting their political weight at the polls not available to the former. The Constitution — a practical instrument of government — makes no such demands on the States.”
Moving from the general to the specific, I think that the Equal Protection Clause demands but two basic attributes of any plan of state legislative apportionment. First, it demands that, in the light of the State’s own characteristics and needs, the plan must be a rational one. Secondly, it demands that the plan must be such as not to permit the systematic frustration of the will of a majority *886 of the electorate of the State.[13] I think it is apparent that any plan of legislative apportionment which could be shown to reflect no policy, but simply arbitrary and capricious action or inaction, and that any plan which could be shown systematically to prevent ultimate effective majority rule, would be invalid under accepted Equal Protection Clause standards. But, beyond this, I think there is nothing in the Federal Constitution to prevent a State from choosing any electoral legislative structure it thinks best suited to the interests, temper, and customs of its people. In the light of these standards, I turn to the Colorado and New York plans of legislative apportionment.
III.
Colorado.
The Colorado plan creates a General Assembly composed of a Senate of 39 members and a House of 65 members. The State is divided into 65 equal population representative districts, with one representative to be elected from each district, and 39 senatorial districts, 14 of which include more than one county. In the Colorado House, the majority unquestionably rules supreme, with the population factor untempered by other considerations. In *887 the Senate rural minorities do not have effective control, and therefore do not have even a veto power over the will of the urban majorities. It is true that, as a matter of theoretical arithmetic, a minority of 36% of the voters could elect a majority of the Senate, but this percentage has no real meaning in terms of the legislative process.[14] Under the Colorado plan, no possible combination of Colorado senators from rural districts, even assuming arguendo that they would vote as a bloc, could control the Senate. To arrive at the 36% figure, one must include with the rural districts a substantial number of urban districts, districts with substantially dissimilar interests. There is absolutely no reason to assume that this theoretical majority would ever vote together on any issue so as to thwart the wishes of the majority of the voters of Colorado. Indeed, when we eschew the world of numbers, and look to the real world of effective representation, the simple fact of the matter is that Colorado’s three metropolitan areas, Denver, Pueblo, and Colorado Springs, elect a majority of the Senate.
The State of Colorado is not an economically or geographically homogeneous unit. The Continental Divide crosses the State in a meandering line from north to south, and Colorado’s 104,247 square miles of area are almost *888 equally divided between high plains in the east and rugged mountains in the west. The State’s population is highly concentrated in the urbanized eastern edge of the foothills, while farther to the east lies that agricultural area of Colorado which is a part of the Great Plains. The area lying to the west of the Continental Divide is largely mountainous, with two-thirds of the population living in communities of less than 2,500 inhabitants or on farms. Livestock raising, mining and tourism are the dominant occupations. This area is further subdivided by a series of mountain ranges containing some of the highest peaks in the United States, isolating communities and making transportation from point to point difficult, and in some places during the winter months almost impossible. The fourth distinct region of the State is the South Central region, in which is located the most economically depressed area in the State. A scarcity of water makes a state-wide water policy a necessity, with each region affected differently by the problem.
The District Court found that the people living in each of these four regions have interests unifying themselves and differentiating them from those in other regions. Given these underlying facts, certainly it was not irrational to conclude that effective representation of the interests of the residents of each of these regions was unlikely to be achieved if the rule of equal population districts were mechanically imposed; that planned departures from a strict per capita standard of representation were a desirable way of assuring some representation of distinct localities whose needs and problems might have passed unnoticed if districts had been drawn solely on a per capita basis; a desirable way of assuring that districts should be small enough in area, in a mountainous State like Colorado, where accessibility is affected by configuration as well as compactness of districts, to enable each *889 senator to have firsthand knowledge of his entire district and to maintain close contact with his constituents; and a desirable way of avoiding the drawing of district lines which would submerge the needs and wishes of a portion of the electorate by grouping them in districts with larger numbers of voters with wholly different interests.
It is clear from the record that if per capita representation were the rule in both houses of the Colorado Legislature, counties having small populations would have to be merged with larger counties having totally dissimilar interests. Their representatives would not only be unfamiliar with the problems of the smaller county, but the interests of the smaller counties might well be totally submerged by the interests of the larger counties with which they are joined. Since representatives representing conflicting interests might well pay greater attention to the views of the majority, the minority interest could be denied any effective representation at all. Its votes would not be merely “diluted,” an injury which the Court considers of constitutional dimensions, but rendered totally nugatory.
The findings of the District Court speak for themselves:
“The heterogeneous characteristics of Colorado justify geographic districting for the election of the members, of one chamber of the legislature. In no other way may representation be afforded to insular minorities. Without such districting the metropolitan areas could theoretically, and no doubt practically, dominate both chambers of the legislature.
“. . . The realities of topographic conditions with their resulting effect on population may not be ignored. For an example, if [the rule of equal population districts] was to be accepted, Colorado would have one senator for approximately every 45,000 persons. Two contiguous Western Region senatorial *890 districts, Nos. 29 and 37, have a combined population of 51,675 persons inhabiting an area of 20,514 square miles. The division of this area into two districts does not offend any constitutional provisions. Rather, it is a wise recognition of the practicalities of life. . . .
“We are convinced that the apportionment of the Senate by Amendment No. 7 recognizes population as a prime, but not controlling, factor and gives effect to such important considerations as geography, compactness and contiguity of territory, accessibility, observance of natural boundaries, conformity to historical divisions such as county lines and prior representation districts, and 'a proper diffusion of political initiative as between a state’s thinly populated counties and those having concentrated masses.’ ” 219 F. Supp., at 932.
From 1954 until the adoption of Amendment 7 in 1962, the issue of apportionment had been the subject of intense public debate. The present apportionment was proposed and supported by many of Colorado’s leading citizens. The factual data underlying the apportionment were prepared by the wholly independent Denver Research Institute of the University of Denver. Finally, the apportionment was adopted by a popular referendum in which not only a 2-1 majority of all the voters in Colorado, but a majority in each county, including those urban counties allegedly discriminated against, voted for the present plan in preference to an alternative proposal providing for equal representation per capita in both legislative houses. As the District Court said:
“The contention that the voters have discriminated against themselves appalls rather than convinces. Difficult as it may be at times to understand mass behavior of human beings, a proper recognition of *891 the judicial function precludes a court from holding that the free choice of the voters between two conflicting theories of apportionment is irrational or the result arbitrary.” Ibid.
The present apportionment, adopted overwhelmingly by the people in a 1962 popular referendum as a state constitutional amendment, is entirely rational, and the amendment by its terms provides for keeping the apportionment current.[15] Thus the majority has consciously chosen to protect the minority’s interests, and under the liberal initiative provisions of the Colorado Constitution, it retains the power to reverse its decision to do so. Therefore, there can be no question of frustration of the basic principle of majority rule.
IV.
New York.
. . Constitutional statecraft often involves a degree of protection for minorities which limits the principle of majority rule. Perfect numerical equality in voting rights would be achieved if an entire State legislature were elected at large but the danger is too great that the remote and less populated sections would be neglected or that, in the event of a conflict between two parts of the State, the more populous region would elect the entire legislature and in its councils the minority would never be heard.
“Due recognition of geographic and other minority interests is also a comprehensible reason for reducing the weight of votes in great cities. If seventy percent of a State’s population lived in a single city and the re *892 mainder was scattered over wide country areas and small towns, it might be reasonable to give the city voters somewhat smaller representation than that to which they would be entitled by a strictly numerical apportionment in order to reduce the danger of total neglect of the needs and wishes of rural areas.”
The above two paragraphs are from the brief which the United States filed in Baker v. Carr, 369 U. S. 186.[16] It would be difficult to find words more aptly to describe the State of New York, or more clearly to justify the system of legislative apportionment which that State has chosen.
Legislative apportionment in New York follows a formula which is written into the New York Constitution and which has been a part of its fundamental law since 1894. The apportionment is not a crazy quilt; it is rational, it is applied systematically, and it is kept reasonably current. The formula reflects a policy which accords major emphasis to population, some emphasis to region and community, and a reasonable limitation upon massive overcentralization of power. In order to effectuate this policy, the apportionment formula provides that each county shall have at least one representative in the Assembly, that the smaller counties shall have somewhat greater representation in the legislature than representation based solely on numbers would accord, and that some limits be placed on the representation of the largest *893 counties in order to prevent one megalopolis from completely dominating the legislature.
New York is not unique in considering factors other than population in its apportionment formula. Indeed, the inclusion of such other considerations is more the rule than the exception throughout the States. Two-thirds of the States have given effect to factors other than population in apportioning representation in both houses of their legislatures, and over four-fifths of the States give effect to nonpopulation factors in at least one house.[17] The typical restrictions are those like New York’s affording minimal representation to certain political subdivisions, or prohibiting districts composed of parts of two or more counties, or requiring districts to be composed of contiguous and compact territory, or fixing the membership of the legislative body. All of these factors tend to place practical limitations on apportionment according to population, even if the basic underlying system is one of equal population districts for representation in one or both houses of the legislature.
That these are rational policy considerations can be seen from even a cursory examination of New York’s political makeup. In New York many of the interests which a citizen may wish to assert through the legislative process are interests which touch on his relation to the government of his county as well as to that of the State, and consequently these interests are often peculiar to the citizens of one county. As the District Court found, counties have been an integral part of New York’s governmental structure since early colonial times, and the many functions performed by the counties today reflect both the historic gravitation toward the county as the central unit of political activity and the realistic fact that *894 the county is usually the most efficient and practical unit for carrying out many governmental programs.[18]
A policy guaranteeing minimum representation to each county is certainly rational, particularly in a State like New York. It prevents less densely populated counties from being merged into multicounty districts where they would receive no effective representation at all. Further, it may be only by individual county representation that the needs and interests of all the areas of the State can be brought to the attention of the legislative body. The rationality of individual county representation becomes *895 particularly apparent in States where legislative action applicable only to one or more particular counties is the permissible tradition.
Despite the rationality of according at least one representative to each county, it is clear that such a system of representation, coupled with a provision fixing the maximum number of members in the legislative body — a necessity if the body is to remain small enough for man-ageably effective action — has the result of creating some population disparities among districts. But since the disparity flows from the effectuation of a rational state policy, the mere existence of the disparity itself can hardly be considered an invidious discrimination.
In addition to ensuring minimum representation to each county, the New York apportionment formula, by allocating somewhat greater representation to the smaller counties while placing limitations on the representation of the largest counties, is clearly designed to protect against overcentralization of power. To understand fully the practical importance of this consideration in New York, one must look to its unique characteristics. New York is one of the few States in which the central cities can elect a majority of representatives to the legislature. As the District Court found, the 10 most populous counties in the State control both houses of the legislature under the existing apportionment system. Each of these counties is heavily urban; each is in a metropolitan area. Together they contain 73.5% of the citizen population, and are represented by 65.5% of the seats in the Senate and 62% of the seats in the Assembly. Moreover, the nine counties comprising one metropolitan area- — New York City, Nassau, Rockland, Suffolk and Westchester — contain 63.2% of the total citizen population and elect a clear majority of both houses of the legislature under the existing system which the Court today holds invalid. Obviously, therefore, the exist *896 ing system of apportionment clearly guarantees effective majority representation and control in the State Legislature.
But this is not the whole story. New York City, with its seven million people and a budget larger than that of the State, has, by virtue of its concentration of population, homogeneity of interest, and political cohesiveness, acquired an institutional power and political influence of its own hardly measurable simply by counting the number of its representatives in the legislature. Elihu Root, a delegate to the New York Constitutional Convention of 1894, which formulated the basic structure of the present apportionment plan, made this very point at that time:
“The question is whether thirty separate centers of 38,606 each scattered over the country are to be compared upon the basis of absolute numerical equality with one center of thirty times 38,606 in one city, with all the multiplications of power that comes from representing a single interest, standing together on all measures against a scattered and disunited representation from the thirty widely separated single centers of 38,606. Thirty men from one place owing their allegiance to one political organization, representing the interest of one community, voting together, acting together solidly; why, they are worth double the scattered elements of power coming from hundreds of miles apart.” 3 Revised Record of the New York State Constitutional Convention of 1894, p. 1215.
Surely it is not irrational for the State of New York to be justifiably concerned about balancing such a concentration of political power, and certainly there is nothing in our Federal Constitution which prevents a State from reasonably translating such a concern into its apportionment formula. See MacDougall v. Green, 335 U. S. 281.
*897 The State of New York is large in area and diverse in interests. The Hudson and Mohawk Valleys, the farm communities along the southern belt, the many suburban areas throughout the State, the upstate urban and industrial centers, the Thousand Islands, the Finger Lakes, the Berkshire Hills, the Adirondacks — the people of all these and many other areas, with their aspirations and their interests, just as surely belong to the State as does the giant metropolis which is New York City. What the State has done is to adopt a plan of legislative apportionment which is designed in a rational way to ensure that minority voices máy be heard, but that the will of the majority shall prevail.
V.
In the allocation of representation in their State Legislatures, Colorado and New York have adopted completely rational plans which reflect an informed response to their particularized characteristics and needs. The plans are quite different, just as Colorado and New York are quite different. But each State, while clearly ensuring that in its legislative councils the will of the majority of the electorate shall rule, has sought to provide that no identifiable minority shall be completely silenced or engulfed. The Court today holds unconstitutional the considered governmental choices of these two sovereign States. By contrast, I believe that what each State has achieved fully comports with the letter and the spirit of our constitutional traditions.
I would affirm the judgments in both cases.

[This opinion applies also to No. 20, WMCA, Inc., et al. v. Lomenzo, Secretary of State of New York, et al, ante, p. 633.]

 See Reynolds v. Sims, ante, pp. 554-555, citing: Ex parte Yarbrough, 110 U. S. 651; United States v. Mosley, 238 U. S. 383; Guinn v. United States, 238 U. S. 347; Lane v. Wilson, 307 U. S. 268; United States v. Classic, 313 U. S. 299; Ex parte Siebold, 100 U. S. 371; United States v. Saylor, 322 U. S. 385; Gomillion v. Lightfoot, 364 U. S. 339; Nixon v. Herndon, 273 U. S. 536; Nixon v. Condon, 286 U. S. 73; Smith v. Allwright, 321 U. S. 649; Terry v. Adams, 345 U. S. 461.

 “Once the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote . . . .” Gray v. Sanders, 372 U. S., at 379. The Court carefully emphasized in Gray that the case did not “involve a question of the degree to which the Equal Protection Clause of the Fourteenth Amendment limits the authority of a State Legislature in designing the geographical districts from which representatives are chosen ... for the State Legislature . . . .” 372 U. S., at 376.

 In Wesberry v. Sanders the Court held that Article I of the Constitution (which ordained that members of the United States Senate shall represent grossly disparate constituencies in terms of numbers, U. S. Const., Art. I, § 3, cl. 1; see U. S. Const., Amend. XVII) ordained that members of the United States House of Representatives shall represent constituencies as nearly as practicable of equal size in terms of numbers. U. S. Const., Art. I, § 2.

 See Reynolds v. Sims, ante, p. 568.

 Id., at 560-561.

 Baker v. Carr, 369 U. S. 186, 266, 301 (Frankfurter, J., dissenting) .
See also the excellent analysis of the relevant historical materials contained in Mr. Justice Harlan's dissenting opinion filed this day in these and their companion cases, ante, p. 589.

 Reynolds v. Sims, ante, p. 567.

 On the basis of the 1960 Census, each Senator from Nevada represents fewer than 150,000 constituents, while each Senator from California represents almost 8,000,000. As will become clear later in this opinion, I do not mean to imply that a state legislative apportionment system modeled precisely upon the Federal Congress would necessarily be constitutionally valid in every State.

 It has been the broad consensus of the state and federal courts which, since Baker v. Carr, 369 U. S. 186, have been faced with the basic question involved in these cases, that the rule which the Court announces today has no basis in the Constitution and no root in *879 reason. See, e. g., Sobel v. Adams, 208 F. Supp. 316, 214 F. Supp. 811; Thigpen v. Meyers, 211 F. Supp. 826; Sims v. Frink, 205 F. Supp. 245, 208 F. Supp. 431; W. M. C. A., Inc., v. Simon, 208 F. Supp. 368; Baker v. Carr, 206 F. Supp. 341; Mann v. Davis, 213 F. Supp. 577; Toombs v. Fortson, 205 F. Supp. 248; Davis v. Synhorst, 217 F. Supp. 492; Nolan v. Rhodes, 218 F. Supp. 953; Moss v. Burkhart, 207 F. Supp. 885; Lisco v. Love, 219 F. Supp. 922; Wisconsin v. Zimmerman, 209 F. Supp. 183; Marshall v. Hare, 227 F. Supp. 989; Hearne v. Smylie, 225 F. Supp. 645; Lund v. Mathas, 145 So. 2d 871 (Fla.); Caesar v. Williams, 84 Idaho 254, 371 P. 2d 241; Maryland Committee for Fair Representation v. Tawes, 228 Md. 412, 180 A. 2d 656, 182 A. 2d 877, 229 Md. 406, 184 A. 2d 715; Levitt v. Maynard, 104 N. H. 243, 182 A. 2d 897; Jackman v. Bodine, 78 N. J. Super. 414, 188 A. 2d 642; Sweeney v. Notte,-R. I.-, 183 A. 2d 296; Mikell v. Rousseau, 123 Vt. 139, 183 A. 2d 817.
The writings of scholars and commentators have reflected the same view. See, e. g., De Grazia, Apportionment and Representative Government; Neal, Baker v. Carr: Politics in Search of Law, 1962 Supreme Court Review 252; Dixon, Legislative Apportionment and the Federal Constitution, 27 Law & Contemp. Prob. 329; Dixon, Apportionment Standards and Judicial Power, 38 Notre Dame Law. 367; Israel, On Charting a.Course Through the Mathematical Quagmire: The Future of Baker v. Carr, 61 Mich. L. Rev. 107; Israel, Nonpopulation Factors Relevant to an Acceptable Standard of Apportionment, 38 Notre Dame Law. 499; Lucas, Legislative Apportionment and Representative Government: The Meaning of Baker v. Carr, 61 Mich. L. Rev. 711; Friedelbaum, Baker v. Carr: The New Doctrine of Judicial Intervention and its Implications for American Federalism, 29 U. of Chi. L. Rev. 673; Bickel, The Durability of Colegrove v. Green, 72 Yale L. J. 39; McCloskey, The Reapportionment Case, 76 Harv. L. Rev. 54; Freund, New Yistas in Constitutional Law, 112 U. Pa. L. Rev. 631, 639; Comment, Baker v. Carr and Legislative Apportionments: A Problem of Standards, 72 Yale L. J. 968.

 See, e. g., De Grazia, Apportionment and Representative Government, pp. 19-63; Ross, Elections and Electors, pp. 21-127; Lakeman and Lambert, Voting in Democracies, pp. 19-37, 149-156; Hogan, Election and Representation; Dahl, A Preface to Democratic Theory, pp. 63-84, 124-151.

 See, e. g., Sandalow, The Limits of Municipal Power Under Home Rule: A Role for the Courts, 48 Minn. L. Rev. 643; Klemme, The Powers of Home Rule Cities in Colorado, 36 U. Colo. L. Rev. 321.

 Even with legislative districts of exactly equal voter population, 26% of the electorate (a bare majority of the voters in a bare majority of the districts) can, as a matter of the kind of theoretical mathematics embraced by the Court, elect a majority of the legislature under our simple majority electoral system. Thus, the Court’s constitutional rule permits minority rule.
Students of the mechanics of voting systems tell us that if all that matters is that votes count equally, the best vote-counting electoral system is proportional representation in state-wide elections. See, e. g., Lakeman and Lambert, supra, n. 10. It is just because electoral systems are intended to serve functions other than satisfying mathematical theories, however, that the system of proportional representation has not been widely adopted. Ibid.

 In Baker v. Carr, 369 U. S. 186, it was alleged that a substantial numerical majority had an effective voice in neither legislative house of Tennessee. Failure to reapportion for 60 years in flagrant violation of the Tennessee Constitution and in the face of intervening population growth and movement had created enormous disparities among legislative districts — even among districts seemingly identical in composition- — -which, it was alleged, perpetuated minority rule and could not be justified on any rational basis. It was further alleged that all other means of modifying the apportionment had proven futile, and that the Tennessee legislators had such a vested interest in maintaining the status quo that reapportionment by the legislature was not a practical possibility. See generally, the concurring opinion of Mr. Justice Clark, 369 U. S., at 251.

 The theoretical figure is arrived at by placing the legislative districts for each house in rank order of population, and by counting down the smallest population end of the list a sufficient distance to accumulate the minimum population which could elect a majority of the house in question. It is a meaningless abstraction as applied to a multimembered body be'cause the factors of political party alignment and interest representation make such theoretical bloc voting a practical impossibility. For example, 31,000,000 people in the 26 least populous States representing only 17% of United States population have 52% of the Senators in the United States Senate. But no one contends that this bloc controls the Senate’s legislative process.

 Within the last 12 years, the people of Michigan, California, Washington, and Nebraska (unicameral legislature) have expressed their will in popular referenda in favor of apportionment plans departing from the Court's rule. See Dixon, 38 Notre Dame Law., supra, at 383-385.

 Brief for the United States as amicus curiae on reargument, No. 6, 1961 Term, pp. 29-30.
The Solicitor General, appearing as amicus in the present cases, declined to urge this Court to adopt the rule of per capita equality in both houses, stating that “[s]uch an interpretation would press the Equal Protection Clause to an extreme, as applied to State legislative apportionment, would require radical changes in three-quarters of the State governments, and would eliminate the opportunities for local variation.” Brief for the United States as amicus curiae, No. 508, 1963 Term, p. 32.

 See Dixon, 38 Notre Dame Law., supra, at 399.

 The following excerpts from the brief of the Attorney General of New York in this case are instructive:
“For example, state aid is administered by the counties in the following areas: educational extension work (N. Y. Education Law §§ 1104, 1113), community colleges (N. Y. Education Law §§6301, 6302, 6304), assistance to physically handicapped children (N. Y. Education Law §4403), social welfare such as medical and other aid for the aged, the blind, dependent children, the disabled, and other needy persons (N. Y. Social Welfare Law §§ 153, 154, 257, 409), public health (N. Y. Public Health Law §§ 608, 620, 636, 650, 660), mental health (N. Y. Mental Hygiene Law, Art. 8-A, § 191-a), probation work (N. Y. Correction Law §14-a), highway construction, improvement and maintenance (N. Y. Highway Law §§ 12, 112, 112-a, 279), conservation (N. Y. County Law §§219, 299-w, N. Y. Conservation Law §§205, 879), and civil defense preparations (State Defense Emergency Act §§ 23-b, 25-a).
“County governments, are, of course, far more than instrumen-talities for the administration of state aid. They have extensive powers to adopt, amend or repeal local laws affecting the county (N. Y. County Law §§301-309), and also play a vital part in the enactment of state laws which affect only a particular county or counties (See N. Y. Constitution, Art. IX, §§ 1, 2). The enactment in 1959 of a new County Charter Law (N. Y. County Law, Art. 6-A), providing opportunity for the fundamental reorganization of county governments by county residents, has given the counties an even greater role to play in the social, economic and political life of modern New York.” Brief for appellees Secretary of State and Attorney General, No. 20, 1963 Term, pp. 42-43.