Charles L. DAVIS and Arthur J. Lewis, Plaintiffs,

v.

Melvin D. SYNHORST, Secretary of State of Iowa, et al., Defendants.

Civ. No. 5-1289.

United States District Court
S. D. Iowa,
Central Division.

May 3, 1963.

Harry H. Smith, Sioux City, Iowa, Robert F. Wilson, Cedar Rapids, Iowa, and C. A. Frerichs, Waterloo, Iowa, for plaintiffs.

Evan Hultman, Atty. Gen. of Iowa, Wilbur N. Bump, Sol. Gen. of Iowa, for defendants.

Before VAN OOSTERHOUT, Circuit Judge, and STEPHENSON and McMANUS, District Judges.

VAN OOSTERHOUT, Circuit Judge.

This case came on for hearing upon the merits before this duly constituted three-judge court pursuant to assignment on March 28 and 29, 1963. Plaintiffs appeared by Harry H. Smith, Robert F. Wilson and C. A. Frerichs, their attorneys, and defendants appeared by Evan Hultman, Attorney General of the State of Iowa, and Wilbur N. Bump, Solicitor General of the State of Iowa, their attorneys. The respective parties introduced their evidence and rested, argued the case orally and submitted written briefs, whereupon the case was submitted and taken under advisement. This case is now ready for decision.

Plaintiffs Davis and Lewis are citizens of the United States and the State of Iowa and are residents and qualified voters in Polk County, Iowa. They bring this class action in their own behalf and in behalf of other Iowa voters similarly situated. Defendants are state and county officials performing various duties in connection with conducting elections for members of the Iowa General Assembly.

Jurisdiction is asserted by virtue of 42 U.S.C.A. §§ 1983 and 1988, and 28 U.S.C.A. § 1343(3), and relief by way of declaratory judgment is asked pursuant to 28 U.S.C.A. §§ 2201–2202.

Plaintiffs' action is based upon alleged violation of federally protected rights guaranteed by the equal protection clause found in § 1 of the 14th Amendment to the Constitution of the United States.[1]

This action is based upon the teachings of Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663. Plaintiffs assert invidious discrimination against them exists by reason of the disparity in their voting rights for members of each House of the Iowa General Assembly. Additionally, plaintiffs claim that other inequitable, irrational and arbitrary factors become the predominant factor in the apportionment of the Legislature and that invidious discrimination exists by reason thereof.

Plaintiffs offered evidence for the purpose of attempting to show that actual discrimination existed against them in the Legislature which impeded the enactment of legislation in which they were interested and which brought about legislation which cast unfair tax burdens upon them.

Plaintiffs' witness Scott Swisher, who has ably served as a member of the Legislature for many years, and defendants' witness William R. Kendrick, who has served for some time as Secretary of the House, each expressed the view that the Legislature has not purposely or intentionally invidiously discriminated against any group or economic interest. There is evidence, as might be expected, of the existence in the Legislature of economic blocks, such as the farm block, the insurance block and the cities group, and that blocks having the largest membership are often more successful in their legislative programs.

As hereinafter pointed out, we believe plaintiffs are entitled to relief if the pattern of representation is invidiously discriminatory. We find it unwise and unnecessary to enter into the political thicket and attempt to determine whether the plaintiffs have established specific instances of discrimination against them and members of their class.

We believe that Justice Stewart in his concurring opinion in Baker v. Carr succinctly states the extent of the holding in such case when he says:

"The Court today decides three things and no more: '(a) that the

---

1. Plaintiffs also assert a violation of their rights to a republican form of government guaranteed by Article 4, Section 4, of the Constitution. Plaintiffs do not point to any greater rights under such provision than those claimed under the 14th Amendment.

court possessed jurisdiction of the subject matter; (b) that a justiciable cause of action is stated upon which appellants would be entitled to appropriate relief; and (c) * * * that the appellants have standing to challenge the Tennessee apportionment statutes.' *Ante*, pp. 197–198." 369 U.S. 265, 82 S.Ct. 736.

 It is of no importance whether or not we agree with the principles announced in Baker v. Carr. We are bound by such decision to the extent that it bears directly upon the issues before us. We believe it to be clear that this court has jurisdiction of the subject matter, that a justiciable cause of action is stated, and that plaintiffs have standing to bring this action.

The basic issues presented for determination are:

1. Do the existing Iowa constitutional provisions relating to representation in the General Assembly, including the 1904 and 1928 amendments as implemented by statute, deny the plaintiffs equal protection of the laws in violation of the 14th Amendment of the United States Constitution?

2. Is the validity of the proposed amendment known as the Shaff Plan, hereinafter described, ripe for adjudication and if so, is such amendment also violative of the 14th Amendment?

3. The remedy to be granted in the event plaintiffs prevail upon the constitutional attack.

We shall discuss the issues in the order hereinabove stated. We shall set forth the pertinent factual background before stating and applying the law relating to the various issues.

*Existing Apportionment.*

The current apportionment of the Iowa General Assembly is fixed by Iowa Constitution Article 3, §§ 6, 34, 35, 36 and 37 as amended, and by Iowa Code §§ 41.1, 42.1–.3, I.C.A.

The Iowa General Assembly consists of a senate of 50 members and a house of 108 members. The state is divided into 50 senatorial districts, each of which elects one senator. Each of Iowa's 90 least populous counties elects a representative, while the 9 most populous counties [2] elect two apiece.

Iowa Const., art. 3, § 35, as amended, provides:

"The House of Representatives shall consist of not more than one hundred and eight members. The Ratio of representation shall be determined by dividing the whole number of the population of the state as shown by the last preceding state or national census, by the whole number of counties then existing or organized, but each county shall constitute one representative district and be entitled to one representative, but each county having a population in excess of the ratio number, as herein provided of three fifths or more of such ratio number shall be entitled to one additional representative, but said addition shall extend only to the nine counties having the greatest population."

Iowa's population under the 1960 census is 2,757,537. Iowa's 99 counties range in population (1960 census) from 7,468 (Adams) to 266,315 (Polk). Thus nearly one-tenth of the state's population is concentrated in Polk County. Polk County is nearly 36 times as populous as Adams County, yet it has only twice the number of representatives in the House. While this is an extreme example, it is not a singular one. Six of Iowa's counties have less than 10,000 inhabitants. Thirty-five counties have a population of less than 15,000 and 76 counties, or over three-fourths of the total number of counties, have a population under 25,000 and hence less than the mean county population of 27,854. Schedule "A" attached to this opinion as an appendix provides a general pic-

2. Black Hawk, Clinton, Dubuque, Johnson, Linn, Polk, Pottawattamie, Scott and Woodbury.

ture of the population distribution among the Iowa counties as of various periods.

It is seen from Schedule "A" that 9 counties have a population in excess of 50,000. Such 9 counties have a combined population of 1,024,485, which is over 37% of the total state population. Their combined representation in the House consists of 18 members or one-sixth of the House membership. The 18 smallest counties also have 18 representatives collectively but their combined population is 179,861, or about 6½% of the state's population. The House is at least potentially controlled by the 55 smallest counties; 27.4% of Iowa's total population elect a majority of the representatives.

Schedule "A" also shows substantial disparities in representation within the one-representative and the two-representative county groups. The 6 counties falling between 40 and 50 thousand population have two or three (or more) times the population of the 58 counties with populations under 20 thousand. Yet all of them have just one representative. Similarly, the 9 populous counties having two representatives range from 53,663 to 266,315 population, the latter figure being about 5 times as great as the former.

With regard to the Senate, the Iowa Constitution, art. 3, § 34, as amended, provides:

"The Senate shall be composed of fifty members to be elected from the several senatorial districts, established by law and at the next session of the general assembly held following the taking of the state and national census, they shall be apportioned among the several counties or districts of the state, according to population as shown by the last preceding census, *but no county shall be entitled to more than one (1) senator.*" (Emphasis added.)

The italicized clause was added by amendment in 1928.

In spite of the constitutional mandate to apportion "according to population,"

the limitation of one Senator per county works a substantial discrimination against the more populous counties.

The average or mean Senatorial district population is 55,151, or one-fiftieth of the total Iowa population. As seen in Schedule "A" again, there are 7 counties with populations substantially greater than 55,000, and they can have at most one representative each in the Senate. Five of these counties have from twice to 5 times the population of the average district.

The Senatorial districts established by the 59th General Assembly are set out in Iowa Code § 41.1, I.C.A. (1962). Each of the seven largest counties constitutes one district, so the disparities in representation are minimized in that regard. However, many of the other districts are much smaller than the average (55,-151). The 26 least populous districts have populations ranging from 29,696 (10th district) to 44,663 (14th district). Combined, they elect a majority of the Senate although they include only 35.6% of all Iowans. The most extreme inequality exists between the 10th district and the 27th (Polk County again); The latter has nearly 9 times the population of the former, while each elects one Senator.

### The Merits.

■ "Invidious discrimination" must be found to exist before it can be concluded that equal protection rights are violated. As Justice Douglas has stated in his concurring opinion in Baker v. Carr, 369 U.S. 186, 244–245, 82 S.Ct. 691, 724:

"The traditional test under the Equal Protection Clause has been whether a State has made 'an invidious discrimination,' as it does when it selects 'a particular race or nationality for oppressive treatment.' See Skinner v. Oklahoma [ex rel. Williamson]. 316 U.S. 535, 541 [62 S.Ct. 1110, 86 L.Ed. 1655]. Universal equality is not the test; there is room for weighting. As we stated in Williamson v. Lee Optical Co.,

348 U.S. 483, 489 [75 S.Ct. 461, 99 L.Ed. 563], 'The prohibition of the Equal Protection Clause goes no further than invidious discrimination.' "

The dissenting opinions in Baker v. Carr and the three concurring opinions show a considerable variance in view as to what constitutes invidious discrimination. As Justice Clark points out in his concurring opinion, the decision gives the lower courts no guides and standards to be applied in measuring invidious discrimination in the present situation.

Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821, strikes down the Georgia County unit system for an election of United States Senators and state officials upon a statewide basis as violative of the equal protection clause of the 14th Amendment. Justice Douglas, writing for the majority, in the course of the opinion states:

> "The conception of political equality from the Declaration of Independence, to Lincoln's Gettysburg Address, to the Fifteenth, Seventeenth, and Nineteenth Amendments can mean only one thing—one person, one vote."

Justice Douglas distinguishes the Gray v. Sanders problem from that presented in Baker v. Carr and disclaims expressing any view upon the legislative apportionment problem beyond what is stated in Baker v. Carr, and specifically says: "Nor does it present the question, inherent in the bicameral form of our Federal Government, whether a State may have one house chosen without regard to population."

Notwithstanding such reservation in the majority opinion, Justices Stewart and Clark in a concurring opinion emphasize that the Sanders opinion has no bearing upon the Baker v. Carr issues.

Justice Harlan, in his dissenting opinion, calls attention to apportionment litigation pending in 30 states and in footnote 2 he lists 10 electoral cases upon the Supreme Court docket. Apparently, none of such cases has as yet been argued or submitted. Until some direction is given with respect to the application of invidious discrimination to the reapportionment cases, the lower courts will continue to have difficulty in determining the standards to be applied in measuring invidious discrimination.

It has been widely accepted that proof of a very substantial disparity in representation is sufficient to establish a prima facie case of invidious discrimination. See, e. g., Thigpen v. Meyers, W.D.Wash., 211 F.Supp. 826, 832; Lisco v. McNichols, D.Colo., 208 F.Supp. 471, 477–478; Moss v. Burkhart, W.D.Okl., 207 F.Supp. 885, 891; Scholle v. Hare, 367 Mich. 176, 116 N.W.2d 350. The burden of proof, of course, is initially on the plaintiffs inasmuch as there exists a strong presumption favoring the validity of the state law. W. M. C. A., Inc. v. Simon, S.D.N.Y., 208 F.Supp. 368, 373; Sobel v. Adams, S.D.Fla., 208 F.Supp. 316, 324. Moreover, the presumption of validity is said to be all the stronger where state constitutional provisions are challenged. Sincock v. Terry, D.Del., 210 F.Supp. 396, 399.

In our present case, a quite substantial disparity in representation has been established with respect to both houses of the General Assembly. In order to avoid the ultimate conclusion that the present apportionment is invidiously discriminatory, the defendants must "adduce evidence of the presence of other factors which might explain this disproportion * * *." Mann v. Davis, E.D.Va., 213 F.Supp. 577, 584; see Thigpen v. Meyers, supra, 211 F.Supp. at 832. If defendants are able to show a rational basis for the classifications made, such showing will refute plaintiffs' prima facie case.

The Supreme Court stated in MacDougall v. Green, 335 U.S. 281, 283–284, 69 S.Ct. 1, 2, 93 L.Ed. 3:

> "To assume that political power is a function exclusively of numbers is

to disregard the practicalities of government. Thus, the Constitution protects the interests of the smaller against the greater by giving in the Senate entirely unequal representation to populations. It would be strange indeed, and doctrinaire, for this Court, applying such broad constitutional concepts as due process and equal protection of the laws, to deny a State the power to assure a proper diffusion of political initiative as between its thinly populated counties and those having concentrated masses, in view of the fact that the latter have practical opportunities for exerting their political weight at the polls not available to the former. The Constitution—a practical instrument of government—makes no such demands on the States. Colegrove v. Green, 328 U.S. 549 [66 S.Ct. 1198, 90 L.Ed. 1432], and Colegrove v. Barrett, 330 U.S. 804 [67 S.Ct. 973, 91 L. Ed. 1262]."

■ Based upon the various opinions in Baker v. Carr and related cases, the lower federal courts have acknowledged the following factors to be considered in determining whether there is any rational design to a plan of unequal representation:

1. The presence or absence of a historical basis for the present complexion of the legislature.

2. The presence or absence of possible remedies available to the electors within the state's political machinery.

3. The accessibility of legislative representatives to their electors and related geographical factors.

4. The solemnity with which the apportionment laws were enacted or adopted.

See W. M. C. A., Inc. v. Simon, supra, 208 F.Supp. at 374, citing Baker v. Carr, supra; Toombs v. Fortson, N.D. Ga., 205 F.Supp. 248; Sanders v. Gray, N.D.Ga., 203 F.Supp. 158, rev'd, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821; Maryland Committee for Fair Representation v. Tawes, Md.Cir.Ct., Anne Arundel Co., Md., May 24, 1962. These factors are closely interrelated, and none of them would provide a conclusive test except in the most unusual factual situations.

Defendants have argued all of the foregoing factors, either expressly or impliedly. Their arguments are persuasive to some extent, but, on the whole, they fail to justify or explain the severe inequalities that exist in both houses.

Population has been a central basis for apportionment of the General Assembly from the time of its territorial predecessors.[3] The original state constitution adopted in 1846 provided at § 31 for the apportionment of senators and representatives among the several counties "according to the number of white inhabitants in each" (but in § 32 provided that no county shall be divided in forming a senatorial or representative district). Moreover, our present constitution required apportionment primarily on the basis of population until the apportionment sections were repealed in 1904.[4]

---

3. An Act Establishing the Territorial Government of Wisconsin § 4, approved April 20, 1836, provides:
 "An apportionment [of the legislative assembly] shall be made as nearly equal as practicable, among the several counties, for the election of the Council and Representatives, giving to each section of the Territory representation in the ratio of its population, Indians excepted, as nearly as may be."
The same provision is made in An Act to Divide the Territory of Wisconsin, and to Establish the Territorial Government of Iowa § 4, approved June 12, 1838, 5 Stat. 235. This latter statute along with the 1787 Northwest Ordinance and the 1846 Iowa Constitution, are reprinted in 1 Iowa Code Ann. pp. 45–105.

4. The Constitution of 1857, art. 3, §§ 34–36, originally provided:
 "Sec. 34. The number of senators shall, at the next session following each period of making such enumeration, and the next session following each United States

It is noted, however, that the same historical authority recognizes the counties as basic units of representation. Counties unquestionably have served traditionally as units of local government, and there are still geographical reasons justifying their use as representative units in state government. Compare W. M. C. A., Inc. v. Simon, supra, 208 F.Supp. at 376–378; Sobel v. Adams, supra, 208 F.Supp. at 321–322; Jackman v. Bodine, 78 N.J.Super. 414, 188 A.2d 642. And certainly a county is more than an accumulation of individuals, thereby justifying some inequalities in favor of the smaller counties. Nonetheless, such considerations would serve only to justify the apportionment in the House of Representatives; the Senate is not basically apportioned in terms of county units.

Defendants also assert that malapportionment if it exists can be effectively cured by methods outlined in the state constitution. Thus, the Iowa Constitution provides for its amendment either by legislative proposal and electoral ratification or by constitutional convention.[5] But as is so often the case, the amendment machinery permits a malapportioned General Assembly to perpetuate the inequality of representation. When amendments are accomplished through the legislative proposal method the initiative is with the legislature; and when the people vote for a constitutional convention the legislature determines how the convention will be con-

census, be fixed by law, and apportioned among the several counties, according to the number of white inhabitants in each. "Sec. 35. The Senate shall not consist of more than fifty members, nor the House of Representatives of more than one hundred; and they shall be apportioned among the several counties and representative districts of the State, according to the number of white inhabitants in each, upon ratios to be fixed by law; but no representative district shall contain more than four organized counties, and each district shall be entitled to at least one representative. Every county and district which shall have a number of inhabitants equal to one-half of the ratio fixed by law, shall be entitled to one representative; and any one county containing in addition to the ratio fixed by law one-half of that number, or more, shall be entitled to one additional representative. No floating district shall hereafter be formed. "Sec. 36. At its first session under this Constitution, and at every subsequent regular session, the General Assembly shall fix the ratio of representation, and also form into representative districts those counties which will not be entitled singly to a representative." [Note: The word "white" wherever it appears in the foregoing sections was deleted by an amendment adopted in 1868.]

5. Iowa Const. art. 10, §§ 1, 3, provide:
 "Section 1. Any amendment or amendments to this Constitution may be proposed in either House of the General Assembly; and if the same shall be agreed to by a majority of the members elected to each of the two Houses, such proposed

amendment shall be entered on their journals, with the yeas and nays taken thereon, and referred to the Legislature to be chosen at the next general election, and shall be published, as provided by law, for three months previous to the time of making such choice; and if, in the General Assembly so next chosen as aforesaid, such proposed amendment or amendments shall be agreed to, by a majority of all the members elected to each House, then it shall be the duty of the General Assembly to submit such proposed amendment or amendments to the people, in such manner, and at such time as the General Assembly shall provide; and if the people shall approve and ratify such amendment or amendments, by a majority of the electors qualified to vote for members of the General Assembly, voting thereon, such amendment or amendments shall become a part of the Constitution of this State.

　　＊　　　＊　　　＊　　　＊　　　＊

"Section 3. At the general election to be held in the year one thousand eight hundred and seventy, and in each tenth year thereafter, and also at such times as the General Assembly may, by law, provide, the question, 'Shall there be a Convention to revise the Constitution, and amend the same?' shall be decided by the electors qualified to vote for members of the General Assembly; and in case a majority of the electors so qualified, voting at such election, for and against such proposition, shall decide in favor of a Convention for such purpose, the General Assembly, at its next session, shall provide by law for the election of delegates to such Convention."

stituted.[6] See Baker v. Carr, 369 U.S. 186, 259, 82 S.Ct. 691, 7 L.Ed.2d 663, (Clark, J., concurring).

Defendants' strongest argument is that a majority of the people have ratified each amendment to the original 1857 constitution providing for the present apportionment system, and that they have voted against holding a constitutional convention every ten years since then. This argument has been rejected by at least one federal three-judge court upon the grounds that "[t]he inalienable constitutional right of equal protection cannot be made to depend upon the will of the majority." Thigpen v. Meyers, supra, 211 F.Supp. at 832, citing Moss v. Burkhart, supra. Indeed, equal protection is characteristically concerned with the rights of minorities.

Nonetheless, the plaintiffs' claims in our present case derive their thrust in some degree from the under-representation of populous counties. Plaintiffs' votes are not diluted in any direct or immediate sense; it is their counties' representation which is diluted, and because of that their votes have less influence in electing members of the General Assembly. Assuredly, as stated in Baker v. Carr, 369 U.S. at 208, 82 S.Ct. at 705, plaintiffs assert a plain, direct, and adequate interest in maintaining the effectiveness of their votes rather than the general right of all citizens to require that their government be administered according to law. There is no question that plaintiffs have standing to sue. But also, their claim is that the apportionment classification "disfavors the voters in the counties in which they reside, placing them in a position of constitutionally unjustifiable inequality vis-a-vis voters in irrationally favored counties." 369 U.S. at 207–208, 82 S.Ct. at 705.

As long as there is *some* justification for diversifying the state's political initiative, the inequalities which arise are more easily accepted (in terms of equal protection) if the plan is given the clear approval of a majority of voters. A constitutional amendment ratified by the people of the state is the most solemn action the state can take. No court should discard it quickly in the absence of overwhelming compulsion.

The 1904 amendment was ratified by a majority of slightly more than 53%, and it carried in nearly every one of the larger counties. It repealed the old apportionment provisions and replaced them with the present provisions, which have since been amended only once—in 1928. The 1928 amendment added the limitation that no *county* shall be entitled to more than one senator.[7] It was ratified by a substantial majority of nearly 64%; in only 5 counties[8] did the majority turn down the amendment. Since the 1928 amendment the voters have rejected a constitutional convention four times—in 1930 and each tenth year since.

The greatest difficulty with defendants' argument is that the people have not ratified the present apportionment system; they ratified the basic structure of the system, but more recent population shifts have brought about severe distortions which were not apparent in 1904. In this connection, reference is again made to Schedule "A".

According to the 1900 Federal Census data—the most recent available when the 1904 amendment was adopted—the average county population was 22,544, and the state could be divided into 50 senatorial districts which would have an average population of 44,637. Compared with such average county and district, Polk County, by far the most populous then (82,624) as now, would not have

6. In 1920 the people called for a constitutional convention, but none was ever held.

7. The Constitution does not specify the number of senatorial districts although it does require 50 senators, no two of which can represent any district composed of a single county.

8. Des Moines, Lee, Linn, Plymouth and Scott. Oddly, Polk County voters favored the measure almost 2-to-1.

been required to suffer underrepresentation in either house by as much as 2-to-1. Moreover, the other larger counties would have been accorded substantially equal representation.

The 1920 population data, which were available when the 1928 amendment was adopted, show a somewhat greater disparity. Polk County's population was about 3.2 times that of the "average" Senatorial district, so a vote in favor of the amendment would approve an inequality in that proportion in the Senate. The next three most populous counties had 1.9, 1.5, and 1.5 times the population of the average Senatorial district.

While some inequalities thus existed when the amendments were adopted, they were neither so extreme nor so frequent as they are today. Since then the great bulk of the counties have remained small in population—indeed, they have generally become somewhat smaller—while a small but significant number of more populous counties have grown immensely. The apportionment we have today is quite different from what it would be if the 1900 and 1920 population data were still current.

Schedule "A" discloses a distinct tendency for the larger urban centers to increase in population, largely at the expense of rural areas. Thus it would appear likely that future state population trends will be such as to increase rather than diminish existing disparities.

The fact that the people of Iowa have repeatedly voted against a constitutional convention is persuasive, but not sufficient to establish their acceptance of the present apportionment. There is no possible way of knowing how many voters voted against the measure even though they regarded the present system as being unsatisfactory. Witnesses who had made some study of the vote on the constitutional convention issue expressed the view that many voters, dissatisfied with the present apportionment, voted against a constitutional convention because they preferred the legislative method of proposing amendments, heretofore set out. Quite possibly a significant number felt that a convention would be futile inasmuch as the details would be left to a malapportioned General Assembly. Compare Thigpen v. Meyers, supra, 211 F.Supp. at 832. The legislature has acted upon reapportionment by adopting the Shaff Plan at two consecutive sessions. This is legislative recognition of needed change in apportionment.

■ The conclusion is almost unavoidable that the disparities present in the apportionment of both houses of the Iowa General Assembly transgress the constitutional limits of equal protection. While there is some justification for some inequality, there is no apparent rational basis for the very substantial inequality that exists in both houses.

The existing constitutional pattern for reapportionment of the house established by the 1904 amendment and the limitation of one senator to a county, established by the 1928 amendment, effectively prevent the legislature from accomplishing anything approaching proportionate representation in the respective branches of the legislature. It is our view that such constitutional provisions in combination prevent proportionate representation in both houses of the General Assembly, and that the constitutional provisions, as they now stand, are invidiously discriminatory and in violation of the equal protection clause of the 14th Amendment.

### The Shaff Plan

Two successive Iowa General Assemblies, meeting in 1961 and 1963, passed the same proposed constitutional amendment relating to legislative apportionment in the manner specified by the Iowa Constitution. See 59 G.A. ch. 344; S.J.R. 1, 60 G.A. ch. ——. Such proposed amendment has been generally referred to as the Shaff Plan and we shall so refer to it. The legislature has provided for the submission of the proposed amendment to a vote of the people at a special election to be held on December 3, 1963.

Plaintiffs have asked us to declare this proposed constitutional amendment to be violative of the 14th Amendment.

The Shaff Plan would apportion the senate on a population basis. The state would be divided into 58 compact districts of equal populations (within 10%), each district to elect one representative. Populous counties could be divided along township and voting district boundaries in order to receive equal representation. Elaborate provisions are made to ensure periodic reapportionment and to afford judicial review in case a redistricting does not conform to the constitutional requirements.

The House would be composed of 99 members, one elected from each county without regard to population differences. Inequalities would arise which are far greater than presently exist in either house, and presumably the disparities would become still more extreme in future years.

It seems clear that the Shaff Plan makes a fair and reasonable provision for proportionate representation in the Senate upon a constitutionally acceptable population basis. Appropriate legislative implementation of such plan would, of course, be required in event the amendment is adopted.

It should not be necessary to detail the representation inequalities inherent in the proposed House plan. They would be nearly the same as in the present system, except the 9 most populous counties would have only one representative instead of two—that is, the disparities between those 9 counties and the smaller ones would be exactly double what it is now. Under the Shaff Plan a mere 23.5% (that's less than one-fourth) of the state's population would be represented by a majority of the House. On a population basis Adams County would be over-represented by 36-to-1 in comparison with Polk County.

The Shaff Plan corrects the lack of proportionate representation with respect to the Senate but provides for the election of a House strictly upon an area basis with one representative given to each county, no consideration being given to the wide variance in the population of the various counties. Thus we are confronted with the issue which Justice Douglas in Gray v. Sanders, supra, states has not been decided, that is, whether one house of a bicameral legislature may be chosen without regard to population. The lack of decision upon such issue is further emphazied by the stay granted by Justice Stewart of the judgment entered by the Supreme Court of Michigan in Scholle v. Hare, 116 N.W.2d 350, by a four-to-three vote. In the Michigan case, the reapportionment of the house was not in issue. The Michigan court's decision found that the senate representation was invidiously discriminatory and provided that the Secretary of State was instructed to apply to the court for direction for an election of senators at large if a valid reapportionment of the senate was not provided for by August 20, 1962. In granting the stay, Justice Stewart stated that the case presents an issue not decided in Baker v. Carr.

The question immediately arises whether this court has jurisdiction to pass upon the constitutionality of the Shaff Plan at this time. It is not now a part of the Iowa Constitution and will only become so if it is approved at the election called for its consideration. No one can now predict with any certainty the result of such election. Thus this court is asked to give an advisory opinion upon an abstract question.[9]

The Supreme Court in Aetna Life Ins. Co. of Hartford, Conn. v. Haworth, 300 U.S. 227, 239–240, 57 S.Ct. 461, 463, 81 L.Ed. 617, states in part:

> "The Constitution limits the exercise of the judicial power to 'cases' and 'controversies.' 'The term "controversies," if distinguishable at all from "cases," is so in that it is less comprehensive than the latter,

9. Section 6.10, Iowa Code 1962, I.C.A., authorizes the state District Courts to give advisory opinions upon proposed constitutional amendments. Such statute in no way enlarges the jurisdiction of the federal courts.

and includes only suits of a civil nature.' * * * The Declaratory Judgment Act of 1934, in its limitation to 'cases of actual controversy,' manifestly has regard to the constitutional provision and is operative only in respect to controversies which are such in the constitutional sense. * * * The Declaratory Judgment Act must be deemed to fall within this ambit of congressional power, so far as it authorizes relief which is consonant with the exercise of the judicial function in the determination of controversies to which under the Constitution the judicial power extends.

"A 'controversy' in this sense must be one that is appropriate for judicial determination. Osborn v. United States Bank, 9 Wheat. 738, 819 [6 L.Ed. 204]. A justiciable controversy is thus distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot."

In Coffman v. Breeze Corporations, Inc., 323 U.S. 316, 324, 65 S.Ct. 298, 302, 89 L.Ed. 264, it is said:

"The declaratory judgment procedure is available in the federal courts only in cases involving an actual case or controversy, * * * and it may not be made the medium for securing an advisory opinion in a controversy which has not arisen."

To like effect see League of Nebraska Municipalities v. Marsh, D.Nebr., 209 F.Supp. 189. For additional authorities, see 26 C.J.S. Declaratory Judgments §§ 24 to 30 and cases cited.

■ Federal courts have approached questions relating to the invalidity of state constitutions and statutes for violation of federal constitutional requirements with great reluctance. Because of the delicate relationships between federal and state governments, federal courts must give a wide latitude to the states in the conduct of their internal affairs.

In W. M. C. A., Inc. v. Simon, supra, 208 F.Supp. at 379 the court observes:

"This court is, of course, bound to give supremacy to the U. S. Constitution over a State Constitution, but unless the invalidity is clear and definite, we are reluctant to overthrow this choice of the electors of this state.

"In this connection we may well heed the wise admonitions of distinguished members of the United States Supreme Court who have spoken as follows:

" 'The traditions and habits of centuries were not intended to be overthrown when that amendment [the Fourteenth] was passed.' Opinion of Mr. Justice Holmes in Interstate Consolidated Street Railway Co. v. Massachusetts, 1907, 207 U.S. 79, 87, 28 S.Ct. 26, 27, 52 L.Ed. 111.

" 'The Constitution as a continuously operating Charter of Government does not demand the impossible or the impractical.' Opinion of Chief Justice Stone in Hirabayashi v. United States, 1943, 320 U.S. 81, 104, 63 S.Ct. 1375, 1387, 87 L.Ed. 1774.

" '* * * [T]he legislature, acting within its sphere, is presumed to know the needs of the people of the State.' Opinion of Chief Justice Hughes in Townsend v. Yeomans, 1937, 301 U.S. 441, 451, 57 S.Ct. 842, 847, 81 L.Ed. 1210."

■ A court in protecting individuals against invidious discrimination constitutionally prohibited, exercises equitable powers. Considerable flexibility and discretion exist with respect to the appropriate method and time for affording relief. See and compare Brown v. Board of Education of Topeka, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083.

■ Some courts have passed upon the validity of proposed constitutional amendments. Sobel v. Adams, D.C.S.D. Fla., 208 F.Supp. 316; Sims v. Frink,

D.C.M.D.Ala., 208 F.Supp. 431. Said cases do not discuss the jurisdiction of a federal court to render advisory opinions upon abstract questions. We can see where, under appropriate circumstances, the validity of proposed amendments may be relevant on the question of whether a state is making a good faith effort to rectify existing invidious discrimination. Upon the present record, we cannot say that Iowa has not been attempting in good faith to provide for constitutional apportionment in its legislative bodies.

In Baker v. Carr, Justice Clark states:

"I would not consider intervention by this Court into so delicate a field if there were any other relief available to the people of Tennessee." 369 U.S. at 258, 82 S.Ct. at 732.

 Many trial courts have recognized the obvious fact that available state procedure for correcting any malapportionment of legislative branches is to be greatly preferred to representation imposed by federal court decree and have withheld entry of a decree for a reasonable time to permit the state to take appropriate action. Sobel v. Adams, D.C. S.D.Fla., 208 F.Supp. 316; D.C., 214 F.Supp. 811; Lisco v. McNichols, D.C. D.Colo., 208 F.Supp. 471, 478–479.

The many conflicting lower court decisions and numerous law review articles.[10] bearing upon the problem here presented shed little light upon the legislative apportionment standards the Supreme Court will ultimately adopt. Support may be found in existing cases for the validity of the Shaff Plan. W. M. C. A., Inc. v. Simon, supra; Sobel v. Adams, supra; Jackman v. Bodine, 78 N.J.Super. 414, 188 A.2d 642.

The historical background for county or area representation is fully set out in Justice Frankfurter's opinion in Baker v. Carr, 369 U.S. pp. 301 to 324, 82 S.Ct.

pp. 755–767. See also W. M. C. A., Inc. v. Simon, supra, 208 F.Supp. p. 376.

The importance of county units in Iowa government and the historical background for county representation in one branch of the legislature has heretofore been set out.

The methods of amending the Iowa Constitution have been discussed and it is shown that the Shaff Plan is the product of one of the amendatory processes. The vote of the people upon the clear issue presented by the Shaff Plan may ultimately be held to be of considerable significance in passing upon the rationality of the proposed amendment. Under such circumstances, we feel that we should not in any way attempt to influence the vote upon the Shaff Plan by expressing a premature view upon its constitutionality. Such course is made clear by reason of our inability upon the basis of existing standards to say with any degree of assurance what standards the Supreme Court may hereafter adopt upon the undecided issue here presented. It is possible that by the time the voters of the state have expressed their view upon the Shaff Plan, further light will be shed upon the standards for determining invidious discrimination in the situation before us by the Supreme Court in some of the cases now pending before such court upon appeal. Moreover, in event the Shaff Plan should be voted down, needless interference with state constitutional processes will be avoided.

### The Remedy.

In our present case, unlike the situation in Baker v. Carr, and many other reported cases, the Iowa legislature has made a conscientious effort to meet the 14th Amendment requirements. Before the Baker v. Carr decision by the Supreme Court in 1962, in 1961 the legislature introduced the constitutional amend-

10. For example, very extensive discussions may be found in Krastin, The Implemation of Representative Government in a Democracy, 48 Iowa L.Rev. 549 (1963); Neal, Baker v. Carr: Politics in Search of Law, 1962 Sup.Ct.Rev. 252; Comment,

Baker v. Carr and Legislative Apportionments: A Problem of Standards, 72 Yale L.J. 968 (1963). See also The Problem of Malapportionment: A symposium on Baker v. Carr, 72 Yale L.J. 7–106 (1962).

ment procedure by proposing the Shaff Plan and the identical plan was again proposed by the 1963 legislature and arrangements have been made for submission of such proposed amendment to the people. The legislature in 1961, as disclosed by 59 G.A. ch. 69, went as far as it could under existing constitutional provisions to make representation in the senate more proportional and by the 59 G.A. ch. 70 made the limited reapportionment of the house required and authorized by the Iowa Constitution.

 The decided cases have, almost without exception, recognized that state instrumentalities should be afforded a reasonable opportunity to work out any constitutionally required apportionment. The Iowa legislature has made progress in this direction and has, we believe, demonstrated that at least a distinct possibility exists that it will provide for the type of apportionment that may ultimately be required when the standards are definitely established.

We have held that the submission of the Shaff Plan to the voters may serve some useful purpose and may have a direct bearing upon the rationality of the apportionment proposed in the amendment. The result of the vote upon such amendment will be available this December.

The Shaff Plan repeals the existing constitutional provisions for apportionment. Thus state constitutional processes have been put in motion which may result in the repeal of the existing constitutional provisions. The well-recognized and established policy of not reaching constitutional issues when other means of solving the problem presented are available and the policy of avoiding unnecessary conflict between federal and state instrumentalities strongly point to the desirability of withholding any adjudication until after the December election.

Moreover, while we have stated our view that the 1904 and 1928 amendments in combination render the present con-

stitutional provisions discriminatory, we have not determined whether the 1928 amendment (which simply limits each county to one senator) alone is discriminatory or whether both amendments must fall, and if so, whether invalidating the existing sections would restore the pre-1904 provisions, or whether the 1904 repealer should be regarded as final and effective so as to leave no restriction in the Iowa constitution upon the composition and apportionment of the two houses. Many of these issues have not been argued and should they become material, we would desire further briefs and argument with respect to what, if any, valid constitutional provisions remain relating to the apportionment of the houses of the legislature.

It is obvious that if the Shaff Plan is not adopted by the vote of the people, such plan will never become a part of the Iowa Constitution. The policy reasons heretofore stated justifying abstention upon the existing constitutional provisions also firmly support abstention upon the constitutionality of the Shaff Plan, should we be in error in our view that the court is without jurisdiction to pass upon such issue at this time.

No need for haste in the entry of a decree on the constitutional attacks made is apparent. No elections of senators or representatives are scheduled before November of 1964 with the primary falling in June of that year.

Inasmuch as a legislative branch of state government is absolutely essential to carry out and operate state government, including any obligation which may exist with respect to apportionment, nothing should be done at this time which carries any reflection upon the legality of the legislative branch of government.

In the exercise of our equity powers, and upon a balance of the equities, we hold that no decree should be entered at this time awarding affirmative relief but that jurisdiction should be retained to hold such further hearings and enter such further orders as may be necessary or appropriate upon the court's own mo-

tion or upon the motion of either of the parties. It is anticipated that a further hearing will be held promptly after the vote upon the Shaff Plan becomes available. Judgment will be entered accordingly.

SCHEDULE "A"

IOWA POPULATION DISTRIBUTION SINCE 1900.

Number of Counties Whose Populations Fall
Within the Given Range.

| Population Range—(thousands) | 1960 | 1930 | 1920 | 1900 |
|---|---|---|---|---|
| 5–10 | 6 | — | — | 3 |
| 10–15 | 29 | 24 | 19 | 16 |
| 15–20 | 23 | 37 | 40 | 36 |
| 20–25 | 18 | 12 | 14 | 22 |
| 25–30 | 5 | 9 | 11 | 9 |
| 30–35 | 1 | 4 | 3 | 3 |
| 35–40 | 2 | 2 | 4 | 3 |
| 40–45 | 2 | 4 | 1 | 1 |
| 45–50 | 4 | — | — | — |
| (Subtotal—under 50,000) | (90) | (92) | (92) | (93) |
| 50–55 | 1 | — | — | 3 |
| 55–60 | 1 | — | 2 | 2 |
| 60–65 | — | 1 | 1 | — |
| 65–70 | — | 2 | — | — |
| 70–75 | — | — | 2 | — |
| 75–80 | — | 1 | — | — |
| 80–85 | 2 | 1 | — | 1 (82,624) |
| 85–90 | — | — | — | |
| 90–95 | — | — | 1 (92,171) | |
| 95–100 | — | — | — | |
| 100–110 | 1 (107,849) | 1 (101,669) | — | |
| 110–120 | 1 (119,067) | — | — | |
| 120–130 | 1 (122,482) | — | — | |
| 130–140 | 1 (136,899) | — | — | |
| 140–150 | — | — | — | |
| 150–160 | — | — | 1 (154,029) | |
| 160–170 | — | — | | |
| 170–180 | — | 1 (172,837) | | |
| 260–270 | 1 (266,315) | | | |

| Populations | 1960 | 1930 | 1920 | 1900 |
|---|---|---|---|---|
| Total State | 2,757,537 | 2,470,939 | 2,404,021 | 2,231,853 |
| Avg. County | 27,854 | 24,959 | 24,283 | 22,544 |
| Avg. Sen. Dist. (1/50 State Pop.) | 55,151 | 49,419 | 48,080 | 44,637 |

McMANUS, District Judge (dissenting).

I concur in part and dissent in part with the Memorandum Opinion and Judgment Entry of my brothers.

This case is one of the younger children of profound and prolific [1] "Mother Baker," [2] sired by that Twentieth Century scalawag Mr. Malapportionment. Here we are asked to pass on (1) federal constitutionality of existing legislative apportionment provisions of a state constitution [3] and implementing statutes and (2) the federal constitutionality of a pro-

1. Cases have arisen in at least thirty-four states during 1962. Political Thickets and Crazy Quilts: Reapportionment and Equal Protection, Robert B. McKay, Vol. 61 No. 4 Michigan Law Review, p. 645, Appendix p. 706–710.

2. Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

3. 12th Amendment (amendment No. 2 of 1904) and the 16th Amendment (amendment of 1928) to the Iowa Constitution.

posed state constitutional amendment.[4] Like all children this has a unique personality, differing from most [5] of its older brothers and sisters. I concur with my brothers that under Baker v. Carr this court has jurisdiction of the subject matter, a justiciable cause of action is stated and plaintiffs have standing to sue.[6] The merits are now before us.

There appears to be no impediment preventing this court, if it so finds, from declaring existing provisions of state constitutions and implementing statutes invalid if they conflict with the United States Constitution.[7] By its Article VI § 2, the United States Constitution is declared to be the Supreme Law of the land and all state constitutions and statutes are subordinated thereto.

As to proposed amendments to state constitutions, though there is a conflict of authority,[8] it is my view the better rule is that if a proposed amendment clearly violates the federal constitution and would cause a great and unnecessary expense, its submission by referendum should be enjoined.[9] The fact that Iowa, by statute, provides for an action to test the legality of a proposed constitutional amendment and provides for enjoining its submission, if found to be unconstitutional, lends further credence to this view. § 6.10 Code of Iowa 1962.

The question then before this court is: Do the existing apportionment provisions of the Iowa Constitution and the apportionment provisions of the Shaff Plan violate the 14th Amendment to the Federal Constitution?

A number of those who have wrestled with Baker v. Carr over the past year have indicated a disenchantment and disappointment that the decision contained no judicially workable standards and suggested no remedies traditionally used by the judiciary.[10]

Perhaps the Supreme Court will, at a later date, declare a neat yardstick for measuring the constitutionality of state apportionment laws and perhaps it won't. In the meantime, the guiding principle is apparent. It has been stated in Baker v. Carr and in many other cases over the years in one form or another, namely, that at the foundation of representative government lies the principle of equality of representation, which means that no voter shall exercise a greater voting power than other voters in the selection of the legislature.[11] This elementary guiding principle does not

4. 59 G.A. ch. 344; S.J.R. 1, 60 G.A. ch. 501, the "Shaff Plan," having passed two successive sessions of the General Assembly, is to be submitted to a vote of the people on December 3, 1963, pursuant to Iowa Const. art. 10 § 1, footnote 5, p. 499, Majority Opinion.

5. Cf. Sincock v. Terry, D.C., 210 F.Supp. 396; Sobel v. Adams, D.C., 208 F.Supp. 316 and Sims v. Frink, D.C., 208 F.Supp. 431.

6. Majority Opinion, p. 494.

7. Second Employers Liability Cases (Mondou v. New York, N. H. & H. R. Co.), 223 U.S. 1, 32 S.Ct. 169, 56 L.Ed. 327; 11 Am.Jur., Constitutional Law § 41, p. 648.

8. 19 A.L.R.2d p. 521, 532.

9. Livermore v. Waite, 102 Cal. 113, 36 P. 424, 25 L.R.A. 312; Sobel v. Adams; Sims v. Frink, supra, footnote 5; 11 Am. Jur., Constitutional Law § 34, p. 640; Matthews v. Turner, 212 Iowa 424, 236 N.W. 412. I would conclude that this court has jurisdiction to enjoin on either the theory of inherent power as a court of equity or under the declaratory judgment statute. It is my view that the Shaff Plan in its present posture is an actual and justiciable controversy within the purview of Rule 57 F.R.Civ.P. and Title 28 U.S.C.A. § 2201, entitling plaintiffs to declaratory judgment as being discretionary with the court under the circumstances of the case exercised in the public interest. Eccles v. Peoples Bank, 333 U.S. 426, 68 S.Ct. 641, 92 L.Ed. 784; Baker v. Carr, supra.

10. Vol. 61 No. 4 Michigan Law Review, p. 659, 700; Majority Opinion, p. 504.

11. Baker v. Carr, supra, 369 U.S. p. 261, 82 S.Ct. p. 733; 2 A.L.R. 1337; Denney v. State ex rel. Basler, 144 Ind. 503, 42 N.E. 929, 31 L.R.A. 726; 81 C.J.S. States § 31e, p. 934; 18 Am.Jur., Elections § 17, p. 192.

require mathematical exactness but only a reasonable approximation.[12]

Every apportionment must stand upon its own particular facts, and deviation from the principle of equality of representation in order to be held unconstitutional must be grave and irrational, Baker v. Carr, supra; Sherrill v. O'Brien, 188 N.Y. 185, 81 N.E. 124; Baird v. Kings County, 138 N.Y. 95, 33 N.E. 827, 20 L.R.A. 81. Peckham, J., in delivering the opinion of the court in the Baird case, stated:

> "While it is impossible, in the nature of the case, to accurately describe and closely limit the amount of deviation from an equal representation that the practical working of the constitution may in this respect permit, it is, on the other hand, sometimes quite possible to say of a particular example that it does or does not violate the constitutional mandate. We have no trouble whatever in detecting the difference between noon and midnight, but the exact line of separation between the dusk of the evening and the darkness of advancing night is not so easily drawn."

It is in the light of this standard that we should test the constitutionality of the existing apportionment provisions of the Iowa Constitution and the proposed apportionment provisions of the Shaff Plan.

*Existing Apportionment Provisions*

I concur with the statistical analysis of my brothers found at pages 495, 496 of the Majority Opinion. A vote for a representative in Adams County is worth nearly eighteen times the vote for a representative in Polk County. A vote for a senator in the 10th District (Louisa and Washington Counties) is worth nearly nine times the vote of a senator in the 27th (Polk County). Though one case

has stated that a two to one ratio is constitutionally perilous, Scholle v. Hare, 367 Mich. 176, 116 N.W.2d 350 (three dissents), it would seem that no reasonable man should find a nine to one and eighteen to one ratio in the twilight zone.

I concur with the findings of fact and conclusions of law of my brothers [13] that the disparities in the existing system of apportionment of both houses of the Iowa General Assembly transgress the constitutional limits of equal protection; that no rational basis appears for the very substantial inequality that exists in both houses; that the existing constitutional pattern for apportionment of the house, established by the 1904 amendment and limitation of one senator to a county, established by the 1928 amendment, as they now stand, in combination, are invidiously discriminatory and in violation of the equal protection clause of the 14th Amendment to the United States Constitution.

In addition I would find that the existing constitutional provisions standing separately violate the 14th Amendment to the Constitution and this because under Art. III §§ 15, 16 and 17 of the Iowa Constitution, in order for a bill to become a law, there must be at least concurrence of both houses of the General Assembly. Thus, if either house is malapportioned and fails to meet the test of equality of representation, it could frustrate the change of existing laws as well as the passage of new laws. I know of no valid reason why both houses should not meet the test of equality of representation. Historically, the founding fathers of the Iowa Constitution designed that the membership of both houses be apportioned according to population,[14] until hamstrung by the amendments now under attack.

12. Baker v. Carr, supra; Giddings v. Blacker, Secretary of State, 93 Mich. 1, 52 N.W. 944, 16 L.R.A. 402; State ex rel. Harte v. Moorhead, 99 Neb. 527, 156 N.W. 1067; Scholle v. Hare, 367 Mich. 176, 116 N.W.2d 350.

13. Majority Opinion, p. 501.

14. Art. III §§ 34 and 35 Iowa Constitution prior to 1904.

## The Shaff Plan

I concur with the following statement at p. 502 in the Majority Opinion describing the Shaff Plan:

"The House would be composed of 99 members, one elected from each county without regard to population differences. Inequalities would arise which are far greater than presently exist in either house, and presumably the disparities would become still more extreme in future years."

Applying the test of equality of representation to the House under this proposal, we find that a vote in Adams County is worth nearly thirty-six times a vote in Polk County. The difference here is clearly noon and midnight and, therefore, I would find and conclude that the Shaff Plan is an obvious violation of the 14th Amendment.

There is undisputed evidence in this record that the approximate cost of the special election provided for in the Shaff Plan to be held on December 3, 1963, will be $250,000.00.[15] In justice and in equity, the plaintiffs, the class they represent and the people of Iowa should be relieved from the expensive gesture of conducting a useless election on the Shaff Plan.

I would further find and conclude that plaintiffs have met their burden of proof on both issues in this case.

## Relief to be Granted

One further question that must be met is the effect of finding and declaring the existing amendments and the Shaff Plan invalid. Though there is a dearth of authority on the subject, I would conclude, in accordance with the common law rule of statutory construction, that when a repealing constitutional amendment is itself held invalid, the previous constitutional provision is revived.[16]

In this connection I would find the several parts of the 12th Amendment (amendment No. 2 of 1904) and the several parts of the Shaff Plan to be inseparable, for in both cases, it is obvious that the intent of the adopters and proposers was to adopt and propose one general scheme in an entirety.[17]

Though §§ 34, 35 and 36 of Art. III of the Iowa Constitution as they existed prior to the 1904 Amendment have at least one serious limitation,[18] the system of legislative apportionment contemplated by the founding fathers of the Iowa Constitution as set out in said sections has a rational historical basis in fact, and in my view would substantially meet the test of equality of representation.

In Baker v. Carr, Mr. Justice Brennan at p. 198 of 369 U.S., at p. 699 of 82 S.Ct. and Mr. Justice Clark at p. 260 of 369 U.S., at p. 733 of 82 S.Ct. expressed optimism and faith that the district court possessed judicial competence to fashion relief if violations of constitutional rights are found. The court specified no remedy.

I dissent from paragraphs 2, 3, 4 and 6 of the Judgment Entry.

Rule 1, Federal Rules of Civil Procedure, provides as follows:

"These rules govern the procedure in the United States district courts in all suits of a civil nature whether cognizable as cases at law or in equity, with the exceptions stated in Rule 81. *They shall be construed to secure the just, speedy, and inexpensive determination of every action.*" (Italics supplied)

There is probably no more elementary mandate under the Federal Rules than that set forth in the second sentence of Rule 1. 1 Barron and Holtzoff Federal Practice and Procedure § 137, p. 585. The rules have for their primary pur-

15. Paragraph 4(d), Pre-Trial Order.

16. 82 C.J.S. Statutes § 307a, p. 523; 16 C.J.S. Constitutional Law § 42b, p. 134.

17. See 11 Am.Jur. Constitutional Law § 52, p. 661.

18. Art. III § 35 Iowa Constitution, " * * * but no representative district shall contain more than four organized counties * * *."

pose the securing of speedy and inexpensive justice in a uniform and well-ordered manner. Des Isles v. Evans, 5 Cir., 225 F.2d 235. In keeping with this spirit and purpose, since plaintiffs have met their burden of proof on the issues, I would grant them immediate appropriate relief.

The Shaff Plan, inter alia, would repeal the 1904 and 1928 Amendments. My brothers reason that judgment on all constitutional questions now before the court should be deferred because:

1. If the Shaff Plan is adopted, the existing constitutional provisions may be repealed and the question of their constitutionality would be moot.

2. Other means of solving the problem are available.

3. There is no need for haste in passing on the constitutional questions at this time because no elections of senators and representatives are scheduled until November of 1964 with the primary in June of that year.

A simple answer to (1) is that the validity of the amendments is not moot at the present time. Furthermore, is the gamble that the Shaff Plan might receive an affirmative vote of the people on December 3, 1963, worthy reason for denying plaintiffs the judgment to which they are presently entitled? I think not. What if the Shaff Plan fails in December? Such eventuality would require further action by this court to enter judgment at least seven months hence which it can enter today.

Regardless of whether the Shaff Plan wins or loses, if it is to be submitted to the vote of the people in December, in justice and equity, aren't the plaintiffs and other Iowa voters similarly situated as much entitled to know before they vote what system of legislative apportionment their state will have if they vote "no," as well as if they vote "yes"?

In answer to (2), the Majority Opinion has conspicuously failed to specify the other available means for solving the problem. It is my view that an affirmative vote on the Shaff Plan will not solve the constitutional problem now before this court. The Shaff Plan win or lose, either or both of the questions will again be before the court.

Though the general election for senators and representatives will not be held until November of 1964, the primary election for those offices will be held on June 1, 1964.[19] Nomination papers for legislative candidates in the primary must be filed between March 7 and March 27, 1964.[20] I would conclude that the spirit of the Federal Rules of Civil Procedure would be better followed and a more orderly administration of justice effected by settling the profound and thorny question of legislative apportionment for Iowa in the year 1963.

Upon the authorities and for the reasons stated herein, I would at this time enter judgment for the plaintiffs declaring the 12th Amendment (amendment No. 2 of 1904) and the 16th Amendment (amendment of 1928) to the Iowa Constitution, together with the implementing legislation enacted pursuant thereto (Chapters 41 and 42 Code of Iowa 1962, I.C.A.) invalid prospectively from and after the date hereof.[21]

I would further enter judgment enjoining defendants from submitting the Shaff Plan to a vote of the people on December 3, 1963, and would declare that the Iowa General Assembly, as presently constituted, should from this date and until December 31, 1963, but not thereafter, function as a de facto body[22] for all valid purposes and for the further purpose of providing means for the enactment of implementing apportionment legislation under the Iowa Constitution as it existed prior to 1904.

19. § 43.7 Code of Iowa 1962, I.C.A.

20. § 43.11 Code of Iowa 1962, I.C.A.

21. Scholle v. Hare, supra

22. Baker v. Carr, supra, 369 U.S. p. 250, 82 S.Ct. p. 727; Cedar Rapids v. Cox, 252 Iowa 948, 108 N.W.2d 253; Scholle v. Hare, supra.